# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Carol M Whitmire,<br><br>             Plaintiff,<br><br>v.<br><br>Wal-Mart Stores Incorporated,<br><br>             Defendant. | No. CV-17-08108-PCT-JAT<br><br>**ORDER** |

Pending before the Court is Defendant Wal-Mart Stores, Inc.'s ("Defendant") Motion for Summary Judgment (Doc. 32) and Plaintiff Carol M. Whitmire's ("Plaintiff") Rule 56(d) Application (Doc. 35 at 11–13). For the reasons set forth below, Plaintiff's Rule 56(d) Application is denied, and Defendant's Motion for Summary Judgment is granted in part and denied in part.

## I.    BACKGROUND

On or about February 20, 2008, Defendant hired Plaintiff Carol M. Whitmire ("Plaintiff") as a Cashier in its Show Low, Arizona store. (Docs. 36 ¶ 1; 33-1 at 11–12, Whitmire Depo. at 35: 22-36:3, 38:1-13). During her new-hire orientation, Plaintiff received training on Defendant's Alcohol and Drug Abuse Policy, as well as its Discrimination and Harassment Prevention Policy. (Docs. 33 ¶ 2; 36 ¶ 2). Plaintiff also acknowledged and signed Walmart's Alcohol and Drug Abuse Policy, indicating her understanding that if "testing indicates the presence of illegal drugs . . . in [her] body in any detectable amount, [she] w[ould] be terminated." (Docs. 33 ¶ 5; 33-3 at 9; 36 ¶ 5).

Plaintiff further acknowledged the drug testing policies and procedures described in this Alcohol and Drug Abuse Policy, "and the use by Wal-Mart of results thereof in further determining [her] continued employment." (Doc. 33-3 at 9).

In December 2013, after working as a Cashier for approximately four years, Plaintiff was promoted to the position of Customer Service Supervisor. (Docs. 33 ¶ 8; 36 ¶ 8). On December 19, 2013, Plaintiff acknowledged that she had the ability to perform the essential functions of this Customer Service Supervisor position either with or without a reasonable accommodation. (Docs. 33 ¶ 9; 33-3 at 25–27; 36 ¶ 9). These essential functions include "maintaining a safe shopping environment," "ensuring a safe work environment," "[o]perat[ing] equipment, such as cash registers and related tools, to process Customer purchases," handling money, and "[s]upervis[ing] Associates." (Docs. 33 ¶ 10; 33-3 at 25; 36 ¶ 10).

In or about the end of 2013 or beginning of 2014, Plaintiff obtained an Arizona medical marijuana card, which she maintained during her employ at Walmart. (Docs. 33 ¶¶ 12–13; 36 ¶¶ 12–13). Plaintiff claims she smokes medical marijuana just before bed as a sleep aid and to help treat the chronic pain she suffers due to arthritis and a prior shoulder surgery. (Doc. 36 ¶¶ 34–36, 39–40). Plaintiff also asserts that she has never brought marijuana to work or used or been impaired by it during her hours of employment. (Doc. 36 ¶ 38).

In January 2016, Defendant modified its Alcohol and Drug Abuse Policy to expressly state that employees are prohibited from "[r]eporting to work under the influence of drugs or alcohol, including medical marijuana." (Docs. 33-3 at 12; 36 ¶ 2). Defendant's amended Alcohol and Drug Abuse Policy also requires employees to submit to a drug or alcohol test if they suffer a workplace injury "that requires medical treatment from an outside health care provider." (Doc. 33-3 at 14).

In March 2016, Plaintiff transferred to Defendant's Taylor, Arizona store. (Docs. 36 ¶ 1; 33-1 at 11–12, Whitmire Depo. at 35: 22-36:3, 38:1-13). While working on May 21, 2016 in the Taylor store, a bag of ice fell on Plaintiff's wrist as she was leveling

the bags in the ice machine. (Docs. 33 ¶ 16; 36 ¶ 16). Plaintiff reported this incident to Management and filed an Associate Incident Report with Defendant that same day. (Docs. 33 ¶ 16; 36 ¶ 16; 36-1 at 12, 32). However, Plaintiff finished her shift and did not seek any medical attention on May 21, 2016 because she did not feel the incident was serious enough. (Docs. 33 ¶ 17; 36 ¶ 17; 36-1 ¶ 15). Defendant's Associate Accident Review Form indicates that Defendant did not find Plaintiff responsible for the incident. (Doc. 36-1 at 32 ("Not conclusive that the associate did not follow safe work practices[.] . . . This could have just as easily happened to a customer.")).

On May 23, 2016, Plaintiff notified Human Resources of continued swelling and pain in her wrist. (Docs. 33 ¶ 18; 36 ¶ 18). Just before 2:00 a.m. on May 24, 2016, Plaintiff smoked medical marijuana prior to going to sleep. (Docs. 33 ¶ 19; 36 ¶ 19; 36-1 ¶ 18). Later that same day (May 24, 2016), Plaintiff clocked in to her scheduled shift at 2:00 p.m., and told Personnel Coordinator Debra Vaughn that her wrist still hurt. (Docs. 33 ¶¶ 20–21; 36 ¶¶ 20–21). Pursuant to Walmart policy, Ms. Vaughn directed Plaintiff to an urgent care clinic for a wrist examination and post-accident urine drug test. (Docs. 33 ¶ 21; 36 ¶ 21). Except for this visit to the urgent care clinic on May 24, 2016, Plaintiff never missed any time at work as a result of her wrist injury. (Docs. 33 ¶ 31; 36 ¶ 31).

At the urgent care clinic, Plaintiff's arm was x-rayed, and she submitted a urine sample for the drug test. (Docs. 33 ¶ 22; 36 ¶ 22). Following this drug screen, Plaintiff claims that she returned to work and informed Ms. Vaughn that the clinic had not taken a copy of her medical marijuana card, even after Plaintiff informed the clinic of her medical marijuana usage and cardholder status. (Doc. 36 ¶¶ 43–44). At this time, Plaintiff asserts that Ms. Vaughn took a copy of the medical marijuana card. (Doc. 36 ¶ 44). This was the first time that Plaintiff informed anyone at Walmart that she had a medical marijuana card. (Docs. 33 ¶ 14; 36 ¶¶ 14, 45). Plaintiff also never informed anyone at Walmart that she had a disability. (Docs. 33 ¶ 15; 36 ¶ 15).

Plaintiff's May 24, 2016 drug screen tested positive for marijuana metabolites at a

quantitative value of greater than 1000 ng/ml. (Doc. 33-3 at 33).[1] In a signed declaration, Ms. Vaughn stated that, "upon reasonable belief, Plaintiff's May 24, 2016 positive test result for marijuana indicated that she was impaired by marijuana during her shift that same day." (Doc. 33-3 at 23, Vaughn Decl. ¶ 14).[2] On May 31, 2016 (prior to the test result being reported to Defendant), Plaintiff had a follow-up interview with a Medical Review Officer to discuss her positive drug screen, at which Plaintiff told the Medical Review Officer that she had an Arizona-issued medical marijuana card. (Docs. 36 ¶ 46; 36-1 at 26). The Medical Review Officer verified Plaintiff's medical marijuana card that same day. (Doc. 36-1 at 26).

In June, Plaintiff received a letter dated June 7, 2016 from the Industrial Commission of Arizona alerting Plaintiff that her employer's insurance carrier had been notified of her workers' compensation claim. (Doc. 36-1 at 10). That same month, Plaintiff received two Notices of Claim Status from the Industrial Commission of Arizona regarding her workers' compensation claim, both of which were dated June 22, 2016. (*Id.* at 14, 16). One of these letters indicated that Plaintiff's claim was accepted, but that no compensation would be paid. (*Id.* at 14). The other letter stated that Plaintiff's injury had not resulted in permanent disability, and indicated that temporary compensation and active medical treatment terminated on May 24, 2016 because "claimant was discharged." (*Id.* at 16).

Following the injury-causing incident on May 21, 2016, Plaintiff continued working full-time until she was suspended due to her positive drug test on July 4, 2016. (Doc. 36 ¶¶ 25, 49). On July 22, 2016 Defendant terminated Plaintiff, only citing her positive drug test as the reason for her termination. (Docs. 33 ¶ 26; 33-3 at 35; 36 ¶ 26). Plaintiff admits that she has no evidence that Defendant terminated her because of her

---

[1] Plaintiff does not challenge the testing method of her drug screen and admits that the results indicate that a marijuana metabolite was present in her urine. (Docs. 33 ¶ 24; 36 ¶ 24).

[2] Ms. Vaughn also states in her Declaration that it is her understanding that the quantitative value of marijuana reflected in Plaintiff's urine screen ("> 1000 ng/ml") is "the maximum reading the test can measure for marijuana." (Doc. 33-3 at 22–23, Vaughn Decl. ¶ 13).

status as a medical marijuana cardholder. (Docs. 33 ¶ 33; 36 ¶ 33). Aside from her termination, Plaintiff does not feel that Defendant discriminated against her in any way. (Docs. 33 ¶ 28; 36 ¶ 28).

On March 22, 2017, Plaintiff dual-filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Arizona Attorney General's Office, Civil Rights Division. (Docs. 36 ¶ 73; 36-1 at 22). After receiving her Notice of Right to Sue from the Arizona Attorney General's Office on June 6, 2017, (Docs. 36 ¶ 74; 36-1 at 24), Plaintiff filed her Complaint on June 9, 2017, (Doc. 1). Plaintiff's Complaint alleges that she was wrongfully terminated and/or discriminated against in violation of the Arizona Medical Marijuana Act ("AMMA"), A.R.S. § 36-2813(B), the Arizona Civil Rights Act ("ACRA"), A.R.S. § 41-1463(B), the Arizona Employment Protection Act ("AEPA"), A.R.S. § 23-1501(A)(3)(b), and the Arizona workers' compensation statutes, A.R.S. §§ 23-901, *et seq*. (Doc. 1 at 1, 4–6).[3] Defendant filed an Answer on August 11, 2017 denying that it wrongfully terminated, discriminated against, or engaged in any conduct toward Plaintiff creating liability. (Doc. 6 at 1). In its Answer, Defendant also alleged as an affirmative defense that it "has established a policy and implemented a drug testing program in compliance with Arizona law, so its actions toward Plaintiff are protected from litigation under A.R.S. § 23-493.06," Arizona's Drug Testing of Employees Act ("DTEA"). (*Id.* at 9).

On February 5, 2018, Defendant responded to Plaintiff's First Set of Interrogatories, stating that "Defendant does not contend Plaintiff was employed in a safety-sensitive position as defined under Arizona law." (Docs. 15; 36-1 at 74–75). However, Defendant thereafter filed a Motion for Summary Judgment which argued, in part, that Plaintiff was in a safety sensitive position, (Doc. 20), and supplemented its interrogatory answer to say the same, (Doc. 28). As a result, the parties attended a

---

[3] Specifically, the four counts in Plaintiff's Complaint are as follows: Count One alleges wrongful termination under the AMMA and the AEPA; Count Two alleges discrimination under the AMMA; Count Three alleges wrongful termination under the ACRA; and Count 4 alleges retaliation under the AEPA for exercising rights under the Arizona workers' compensation statutes. (Doc. 1 at 4–6).

Discovery Dispute Hearing on August 22, 2018, at which the Court ordered that Defendant's supplemental response to its interrogatory answer (Doc. 28) be struck as untimely, and precluded any argument by Defendant that Plaintiff was in a safety sensitive position. (Doc. 31). The Court also struck Defendant's Motion for Summary Judgment (Doc. 20), Plaintiff's Response (Doc. 24), and Defendant's Reply (Doc. 29). (Doc. 31).

On August 30, 2018, Defendant re-filed its Motion for Summary Judgment (Doc. 32), to which Plaintiff filed a Response and Rule 56(d) Application (Doc. 35) on October 1, 2018. On October 18, 2018, Defendant filed a Reply in support of its Motion for Summary Judgment. (Doc. 37).[4] After hearing oral argument on November 13, 2018, the Court issued an Order on November 21, 2018 declining to rule on Defendant's Motion for Summary Judgment (Doc. 32) until it received supplemental briefing on: (1) why the Court should or should not hold that sections 23-493(6) and 23-493.06(A)(6) of the DTEA unconstitutionally amend or implicitly repeal sections 36-2813(B)(2) and 36-2814(A)(3) of the AMMA; and (2) if the Court does find these sections of the DTEA unconstitutional under the Voter Protection Act, why Plaintiff should or should not be entitled to summary judgment on her claim under the AMMA pursuant to Fed. R. Civ. P. 56(f). (Doc. 44). The parties each filed briefs addressing these issues on December 7, 2018. (*See* Docs. 48; 49).

On November 21, 2018, Plaintiff filed a Notice of Constitutional Question (Doc. 45) pursuant to Fed. R. Civ. P. 5.1(a) and certified that she served a copy of this Notice on the Attorney General for the State of Arizona via certified mail, return receipt requested on that same date. The Court served its Certification of Constitutional Question (Doc. 46) in accordance with Fed. R. Civ. P. 5.1(b) and 28 U.S.C. § 2403(b) via certified mail on the Attorney General for the State of Arizona on November 27, 2018. The Attorney General did not intervene within sixty days from the date Plaintiff filed her

---

[4] After receiving the parties' Joint Motion requesting that the Court extend the deadline for Defendant to file its Reply, (Doc. 38), the Court ordered that Defendant's Reply filed on October 18, 2018 was deemed to be timely, (Doc 39).

Notice of Constitutional Question—the deadline set in the Court's Certification Order in accordance with Fed. R. Civ. P. 5.1(c). (Doc. 46 at 2). However, the State of Arizona did enter an appearance as a proposed *amicus* on January 22, 2019. (Docs. 53; 54). Finding that allowing the State of Arizona's proposed *amicus curiae* brief in support of no party would aid the Court in resolving the pending matters, the Court granted the State of Arizona's Motion for Leave to File Amicus Curiae Brief (Doc. 54) on January 23, 2019. (Doc. 55).[5] The Court now rules on Defendant's Motion for Summary Judgment (Doc. 32) and Plaintiff's Rule 56(d) Application (Doc. 35 at 11–13).

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id*. 56(c)(1)(A-B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of demonstrating to the Court the basis for the motion and the elements of the cause of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id*. at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id*. A material fact is any factual issue that may affect the outcome of the case under the governing substantive law.

---

[5] The Court deems the State of Arizona's Proposed Amicus Curiae Brief in Support of No Party at Doc. 54-1 at 1–5 to be filed as of January 23, 2019, the date of the Order granting leave.

- 7 -

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 248. The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247–48. However, in the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

At the summary judgment stage, the Court's role is to determine whether there is a genuine issue available for trial. There is no issue for trial unless there is sufficient evidence in favor of the non-moving party for a jury to return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 249–50. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted).

## III. ANALYSIS

Defendant moves for complete summary judgment on Plaintiff's lawsuit, claiming there is no genuine issue of material fact on any of Plaintiff's claims. (Doc. 32 at 1, 16). In opposition, Plaintiff asks that the Court deny summary judgment on all counts and enter partial judgment for Plaintiff on liability on her AMMA and AEPA claims pursuant to Fed. R. Civ. P. 56(f). (Doc. 35 at 1). Alternatively, Plaintiff requests that the Court's ruling be deferred under Fed. R. Civ. P. 56(d). (*Id.* at 11–13, 17). The Court now addresses each of Plaintiff's claims, and all related arguments, in turn.

### A. Discrimination under the AMMA, and Wrongful Termination under the AMMA and AEPA

Plaintiff alleges that Defendant discriminated against her in violation of the

AMMA, A.R.S. § 36-2813(B), by suspending her without pay and then terminating her because of her positive drug screen.[6] (Doc. 1 at 3–5). Plaintiff also contends that Defendant wrongfully terminated her in violation of the AEPA, A.R.S. § 23-1501(A)(3)(b), by firing her because of her positive drug screen in violation of the public policy set forth in A.R.S. § 36-2813(B) of the AMMA.[7] (Doc. 1 at 4).

### 1. The AMMA

In the November 2010 general election, Arizona voters enacted the AMMA, A.R.S. § 36-2801 *et seq.*, by ballot initiative. *State v. Gear*, 372 P.3d 287, 288 (Ariz. 2016). Under the AMMA "a 'qualifying patient' diagnosed with a 'debilitating medical condition' may obtain a registry card from the Arizona Department of Health Services" to buy and use medical marijuana.[8] *Id.* (citing A.R.S. §§ 36-2801(3), (13); 36-2804.02). The AMMA includes an anti-discrimination provision, A.R.S. § 36-2813(B), which provides, in pertinent part, that:

> Unless a failure to do so would cause an employer to lose a monetary or licensing related benefit under federal law or regulations, an employer may not discriminate against a person in hiring, termination or imposing any term or condition of employment or otherwise penalize a person based upon . . . [a] registered qualifying patient's positive drug test for marijuana components or metabolites, unless the patient used, possessed or was impaired by marijuana on the premises of the place of employment or during the hours of employment.

A.R.S. § 36-2813(B).

The AMMA also provides that it does not require "[a]n employer to allow . . . any employee to work while under the influence of marijuana," and does not "prohibit[] an

---

[6] Plaintiff's discrimination claim under the AMMA is the second count in her Complaint. (Doc. 1 at 4–5).

[7] Plaintiff's wrongful termination claim under the AMMA and AEPA is the first count in her Complaint. (Doc. 1 at 4).

[8] Defendant does not dispute that Plaintiff is a qualifying patient under the AMMA. (*See* Docs. 2; 32).

employer from disciplining an employee for . . . working while under the influence of marijuana." *Id.* § 36-2814(A)(3)–(B). However, "a registered qualifying patient shall not be considered to be under the influence of marijuana solely because of the presence of metabolites or components of marijuana that appear in insufficient concentration to cause impairment." *Id.* § 36-2814(A)(3).

## 2. Whether the AMMA Provides a Private Cause of Action

In the second count of her Complaint, Plaintiff alleges that Defendant discriminated against her in violation of the AMMA, A.R.S. § 36-2813(B), by suspending her without pay and then terminating her because of her positive drug screen. (Doc. 1 at 4–5). Defendant contends that this discrimination claim under the AMMA fails as a matter of law because the AMMA does not provide a private cause of action. (Doc. 32 at 5). As there are no reported Arizona decisions discussing a private right of action for employment discrimination under the AMMA, this appears to be a question of first impression. "When a federal court must determine a novel issue of state law, the court attempts to predict how the state's highest court would decide the issue." *Picht v. Peoria Unified Sch. Dist. No. 11 of Maricopa Cty.*, 641 F. Supp. 2d 888, 899 (D. Ariz. 2009) (citing *Ariz. Electric Power Coop. v. Berkeley*, 59 F.3d 988, 991 (9th Cir. 1995)).

"When, as here, a statute does not expressly create a cause of action to enforce its terms, that statutory 'silence' is not dispositive." *Gersten v. Sun Pain Mgmt., P.L.L.C.*, 395 P.3d 310 (Ariz. Ct. App. 2017) (citing *Napier v. Bertram*, 954 P.2d 1389, 1391 (Ariz. 1998)). Rather, "determining whether a statute implicitly creates a private right of action requires considering 'the context of the statutes, the language used, the subject matter, the effects and consequences, and the spirit and purpose of the law.'" *Picht*, 641 F. Supp. 2d at 899 (quoting *Transamerica Financial Corp. v. Superior Court*, 761 P.2d 1019, 1020 (Ariz. 1988)); *see Napier*, 954 P.2d at 1391–92. "A private cause of action has been implied when no other remedy for violation of the statute was available." *Id.* (citing *Douglas v. Window Rock Consolidated Sch. Dist. No. 8*, 78 P.3d 1065, 1069 (Ariz. Ct. App. 2003)). Applying these principles here, the Court holds that A.R.S. § 36-2813(B)

creates a private cause of action for its alleged violation.

Section 36-2813(B) of the AMMA does not provide an express cause of action. However, the parties disagree on whether *Gersten v. Sun Pain Mgmt., P.L.L.C.*, 395 P.3d at 313, holds that there is no implied private cause of action under the AMMA. (*See* Docs. 32 at 5–6; 35 at 3–5). Specifically, Defendant cites *Gersten* for the proposition that "the AMMA has been held not to provide either an express or implied private cause of action," (Doc. 32 at 5), whereas Plaintiff claims that Defendant's reliance on this Arizona Court of Appeals decision is mistaken because "*Gersten* cannot be read for such a blanket statement," (Doc. 35 at 4). On this point, the Court agrees with Plaintiff.

In *Gersten*, a physician discharged a patient for obtaining a registry identification card to use medical marijuana. *Gersten*, 395 P.3d at 311–12. Suing his former physician for damages and equitable relief, the patient alleged that the physician's conduct constituted a violation of A.R.S. § 36-2813(C).[9] *Id.* at 312. The Superior Court granted the physician's motion to dismiss under Arizona Rule of Civil Procedure 12(b)(6) for failure to state a claim on the grounds "that A.R.S. § 36-2813(C) did not create a private cause of action for its alleged violation." *Gersten*, 395 P.3d at 312.

Upon the patient's appeal, the Arizona Court of Appeals noted that although § 36-2813(C) ensures "that qualifying patients will not 'otherwise' be disqualified from medical care solely because of their authorized use of medical marijuana," the appellate court stressed that § 36-2813(C) does not "obligate a physician to extend or continue medical care to a qualifying patient." *Id.* at 313. Consequently, the appellate court agreed with the court below that § 36-2813(C) does not create a private cause of action. *Id.* However, in reaching this decision, *Gersten* expressly distinguished the physician

---

[9] This portion of the AMMA states:

> For the purposes of medical care, including organ transplants, a registered qualifying patient's authorized use of marijuana must be considered the equivalent of the use of any other medication under the direction of a physician and does not constitute the use of an illicit substance or otherwise disqualify a registered qualifying patient from medical care.

A.R.S. § 36-2813(C).

provision, § 36–2813(C), from the anti-discrimination provision, § 36–2813(B):

> The wording of A.R.S. § 36–2813(C) does not . . . attempt to regulate the relationship between a physician and patient. *This distinction becomes clear when examining A.R.S. § 36–2813(C) in context and comparing it to other provisions of the Act that attempt to regulate the conduct of schools, landlords, and employers.* For example, A.R.S. § 36–2813(A) provides that "[n]o school or landlord may refuse to enroll or lease to and may not otherwise penalize a person solely for his status as a cardholder, unless failing to do so would cause the school or landlord to lose a monetary or licensing related benefit under federal law or regulations." In a similar vein, A.R.S. § 36–2813(B) provides that, with certain exceptions, an employer may not discriminate against a person in hiring, terminating, or imposing any term or condition of employment. *Unlike these provisions, A.R.S. § 36–2813(C) imposes no affirmative obligation* on a physician to treat or continue treating a qualifying patient. Given this, there is no basis for implying a private cause of action against a physician to enforce an affirmative obligation to treat or continue treating a qualifying patient that does not exist under A.R.S. § 36–2813(C).

*Id.* at 313–14 (emphasis added).

This distinction drawn by the appellate court in *Gersten* insinuated that, unlike § 36–2813(C), an implied private cause of action exists under § 36–2813(B) because this subsection imposes on employers an affirmative obligation to abide by the anti-discrimination mandate of the statute. Section 36–2813(C) is also distinguishable from the anti-discrimination provision, § 36–2813(B), because there is a pre-existing mechanism for wronged patients to enforce violations of § 36–2813(C) by submitting a complaint to the Arizona Medical Board to investigate and discipline a physician for unprofessional conduct, which includes the violation of any state law applicable to the practice of medicine, such as the AMMA. *Gersten*, 395 P.3d at 314. In contrast, "there is no such independent enforcement mechanism against employers" for violations of § 36–2813(B). (Doc. 35 at 5). This suggests that an implied private cause of action is needed to

implement the directive of § 36–2813(B). *See Picht*, 641 F. Supp. 2d at 899 ("A private cause of action has been implied when no other remedy for violation of the statute was available.").

In support of her argument that an implied private right of action exists in § 36–2813(B) of the AMMA, Plaintiff points to H.B. 2541, which the Arizona Legislature passed in April 2011 in response to the enactment of the AMMA. (Doc. 35 at 5). H.B. 2541 amended A.R.S. § 23-493.06(A)(6) of the DTEA to expand protections for employers who terminate an employee "based on the employer's good faith belief that [the] employee had an impairment while working while on the employer's premises or during hours of employment." *See* DRUGS, 2011 Ariz. Legis. Serv. Ch. 336 (H.B. 2541) (West). H.B. 2541 also added the "safety-sensitive" concept to § 23-493.06(A)(7) of the DTEA, which permits an employer to "exclude an employee from performing a safety-sensitive position" if the employer has a "good faith belief that the employee is engaged in the current use of any drug" which "could cause an impairment." *Id.* According to Plaintiff, H.B. 2541 creates "exceptions and modifications that directly impact Subsection B" of § 36–2813 of the AMMA, thus showing that "the Legislature believed that employers had new exposure to private lawsuits because of the AMMA." (Doc. 35 at 5). The Court agrees, as the Fact Sheet for H.B. 2541 explicitly mentions the AMMA before introducing the above modifications to the DTEA. *See* Arizona Senate Fact Sheet, 2011 Reg. Sess., H.B. 2541 (Mar. 25, 2011). That the Arizona Legislature made these modifications to the DTEA to protect employers from litigation suggests that the Legislature believed the AMMA supplied an implied private right of action for employees against employers allegedly violating § 36–2813(B) of the AMMA.

While Defendant claims that "[a]ll other courts considering this issue have held that similar medical marijuana laws were enacted to decriminalize medical marijuana use, not create an implied cause of action against employers," (Doc. 32 at 6), the Court is not so convinced. In support of this contention, Defendant cites *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428 (6th Cir. 2012). In *Casias*, the plaintiff, a medical marijuana user,

contended that Wal-Mart wrongfully discharged him in violation of Michigan's Medical Marihuana Act ("MMMA") after he tested positive for marijuana in violation of Wal-Mart's drug use policy. *Id.* at 431–32. Appealing the district court's dismissal of his case, the plaintiff argued that the MMMA, Mich. Comp. Laws § 333.26424(a), "protects patients against disciplinary action in a private employment setting for using marijuana in accordance with Michigan law." *Id.* at 434. Section 333.26424(a) of the MMMA provides, in relevant part:

> A qualifying patient who has been issued and possesses a registry identification card shall not be subject to arrest, prosecution, or penalty in any manner, or denied any right or privilege, including but not limited to civil penalty or disciplinary action by a business or occupational or professional licensing board or bureau, for the medical use of marihuana in accordance with this act[.]

Mich. Comp. Laws § 333.26424(a).

Agreeing with the district court that the "statute never expressly refers to employment, nor . . . require[s] or impl[ies] the inclusion of private employment in its discussion of occupational or professional licensing boards[,]" the Sixth Circuit affirmed. *Casias*, 695 F.3d at 436. After determining that the MMMA's language did not support the plaintiff's interpretation that § 333.26424(a) provides protection against disciplinary actions by a business because "*the statute fails to regulate private employment actions*[,]" the Sixth Circuit concluded that § 333.26424(a), "does not impose restriction on private employers, such as Wal-Mart." *Id.* at 435–36 (emphasis added).

Whereas the MMMA statute in *Casias* "fails to regulate private employment actions," *Casias*, 695 F.3d at 436, section 36–2813(B) of the AMMA provides an affirmative obligation on employers to abide by the anti-discrimination mandate of the statute. *See* A.R.S. § 36–2813(B) (" . . . an employer *may not discriminate* against a person in hiring, termination or imposing any term or condition of employment or otherwise penalize a person . . . .") (emphasis added). Based on the drastic dissimilarity

of the medical marijuana statute at issue in *Casias* to § 36–2813(B) of the AMMA, the Court finds Defendant's extensive reliance on *Casias* futile.

The other cases cited by Defendant fare no better, as none of these cases involve medical marijuana statutes with anti-discrimination provisions even remotely similar to § 36–2813(B). Rather, "[e]ach of these cases involves a statute or initiative that is either silent on employment, or expressly authorizes discrimination against medical marijuana users." (Doc. 35 at 6); *see Coles v. Harris Teeter, LLC*, 217 F. Supp. 3d 185, 188 (D.D.C. 2016); *Steele v. Stallion Rockies Ltd*, 106 F. Supp. 3d 1205, 1219 (D. Colo. 2015); *Swaw v. Safeway, Inc.*, No. C15-939 MJP, 2015 WL 7431106, at *1 (W.D. Wash. Nov. 20, 2015); *see also Roe v. TeleTech Customer Care Mgmt., LLC*, 216 P.3d 1055, 1059–60 (Wash. Ct. App. 2009) (holding that Washington State Medical Use of Marijuana Act, RCW 69.51A.040(1), did not create an implied cause of action against employers who terminate, or fail to hire, an individual solely based on his or her use of medical marijuana where statute only created an affirmative defense to state criminal prosecution for possession of marijuana and did not "prohibit private employers from maintaining a drug-free workplace and terminating employees who use medical marijuana"); *Ross v. RagingWire Telecomms., Inc.*, 174 P.3d 200, 205–07 (Cal. 2008) (holding that disability discrimination provisions of California Fair Employment and Housing Act did not require employer to accommodate employee's use of medical marijuana where the operative provisions of California's medical marijuana statute, the Compassionate Use Act, Health & Saf. Code § 11362.5, "do not speak to employment law" but, rather, "speak exclusively to the criminal law"); *Johnson v. Columbia Falls Aluminum Co.*, 213 P.3d 789 (Table), 2009 WL 865308, at *2 (Mont. 2009) (holding that Montana's Medical Marijuana Act, MCA 50–46–205(2)(b), did not provide employee with an express or implied private right of action for negligence or negligence per se against employer following employee's termination for failing a drug test due to his medical marijuana use where state's medical marijuana act was essentially a "decriminalization" statute which specifically provided that it could not be construed to require employers "to

accommodate medical use of marijuana in any workplace").

Defendant also cites *Coles v. Harris Teeter, LLC*, where a district court held that an employer's termination of an employee who failed a drug test due to his use of medical marijuana did not violate D.C.'s public policy of allowing qualifying patients to use medical marijuana prescribed by their physicians. 217 F. Supp. 3d at 188. In arriving at this conclusion, the court clarified that D.C.'s Medical Marijuana Treatment Act, D.C. Code § 7-1671.01, *et seq.*, "did not explicitly mandate" that employers had to accommodate such legal marijuana use, and, at most, "maintained a public policy that decriminalizes and allows the consumption of marijuana for private medical reasons"—a "far cry from prohibiting employers from terminating such users." *Id.* In contrast to D.C.'s Medical Marijuana Treatment Act, the AMMA goes one step beyond simply decriminalizing medical marijuana for qualifying patients by prohibiting employers from terminating such users unless the qualifying patient used, ingested, possessed, was impaired by or was under the influence of marijuana at work, or unless the employer's failure to discriminate against that qualifying patient would cause them to "lose a monetary or licensing related benefit under federal law or regulations." A.R.S. §§ 36–2813(B), 36-2814(A).

Similarly, *Steele v. Stallion Rockies Ltd* fails to provide support for Defendant's contention that there is no implied cause of action in the AMMA, as that case also involves a medical marijuana statute with little similarity to § 36–2813(B). 106 F. Supp. 3d at 1219. In *Steele*, the district court dismissed the plaintiff's claims alleging breach of contract and discrimination in violation of the ADEA, ADA, and the Colorado Anti-Discrimination Act where the plaintiff was terminated for off-the-job use of medical marijuana because the court found that Colorado's medical marijuana act did not extend so far as to shield the plaintiff "from the implementation of his employer's standard policies against employee misconduct." *Id.* at 1214, 1219 n. 6. Rather, as noted by Plaintiff, Colorado's medical marijuana statute, Colo. Rev. Stat. Ann. § 18-18-406.3, fails to "mention employment at all." (Doc. 35 at 6). This is in stark contrast to the anti-

discrimination provision of the AMMA. *See* A.R.S. § 36–2813(B). Moreover, Art. XVIII, sec. 14 of the Colorado Constitution—passed by voters in response to Colorado's medical marijuana statute—explicitly states: "Nothing in this section shall require any employer to accommodate the medical use of marijuana in any work place." Colo. Const. art. XVIII, § 14(10)(b).

Further, the Washington medical marijuana statute at issue in *Swaw v. Safeway, Inc.*, RCW 69.51A.060, differs drastically from § 36–2813(B) of the AMMA as well. *Swaw*, 2015 WL 7431106, at *1. In *Swaw*, the plaintiff brought suit against his former employer, asserting that he was discriminated against on the basis of his disabilities when the employer fired him for testing positive for marijuana, which the plaintiff used after hours pursuant to a valid Washington state medical marijuana prescription. *Id.* In granting the employer's motion for judgment on the pleadings, the district court concluded that RCW 69.51A.060 of Washington's Medical Use of Marijuana Act "does not require employers to accommodate the use of medical marijuana where they have a drug-free workplace, even if medical marijuana is being used off site to treat an employee's disabilities." *Id.* (citing RCW 69.51A.060(6)[10] ("Employers may establish drug-free work policies. Nothing in [the Medical Use of Marijuana Act] requires an accommodation for the medical use of cannabis if an employer has a drug-free workplace.")). In contrast, the AMMA makes no such exception for employers who maintain drug-free workplace policies. *See* A.R.S. § 36-2801 *et seq.*

Contrary to the case law cited by Defendant, Plaintiff points to two cases, *Noffsinger v. SSC Niantic Operating Co. LLC*, 273 F. Supp. 3d 326, 339–40 (D. Conn. 2017) and *Callaghan v Darlington Fabrics Corp.*, No. PC-2014-5680, 2017 WL 2321181, at *1 (R.I. Super. May 23, 2017), referring to medical marijuana statutes with anti-discrimination provisions analogous to § 36-2813(B) of the AMMA.[11] In *Noffsinger*,

_____

[10] Due to amendments of RCW 69.51A.060 effective July 1, 2016, former subsection 6 is now subsection 7. *See* Cannabis Patient Protection Act—Establishment, 2015 Wash. Legis. Serv. Ch. 70 (S.S.S.B. 5052) (West).

[11] In *Noffsinger*, the court noted that Arizona is one of nine states which have passed medical marijuana laws with explicit anti-discrimination protections from adverse

- 17 -

the district court considered whether a provision of Connecticut's Palliative Use of Marijuana Act ("PUMA"), which explicitly prohibits discrimination by employers against qualifying patients who use marijuana outside the workplace, provided an implied private right of action. *Noffsinger*, 273 F. Supp. 3d at 331, 339–40 (citing Conn. Gen. Stat. § 21a-408p(b)(3)). There, a qualifying patient under PUMA brought suit against an employer who denied her a job position after she tested positive for marijuana during a pre-employment screening, contending that the employer's actions constituted a violation of PUMA's anti-discrimination provision, Conn. Gen. Stat. § 21a-408p(b)(3). *Id.* at 331–32. This anti-discrimination provision states:

> Unless required by federal law or required to obtain federal funding: . . . (3) No employer may refuse to hire a person or may discharge, penalize or threaten an employee solely on the basis of such person's or employee's status as a qualifying patient or primary caregiver under sections 21a-408 to 21a-408n, inclusive. Nothing in this subdivision shall restrict an employer's ability to prohibit the use of intoxicating substances during work hours or restrict an employer's ability to discipline an employee for being under the influence of intoxicating substances during work hours.

Conn. Gen. Stat. § 21a-408p(b)(3).

Denying the employer's motion to dismiss the qualifying patient's claim under Conn. Gen. Stat. § 21a-408p(b)(3), the court concluded that PUMA's anti-discrimination provision provides a private cause of action. *Noffsinger*, 273 F. Supp. 3d at 341, 343. In arriving at this conclusion, the court considered how the qualifying patient "certainly falls within the class for whose benefit the statute was enacted," and found "no indication of legislative intent to deny a private cause of action" nor indication that a private cause of

---

employment actions. *Noffsinger*, 273 F. Supp. 3d at 331 n. 1; *see* A.R.S. § 36-2813; Conn. Gen. Stat. § 21a-408p(b); Del. Code Ann. tit. 16, § 4905A; 410 Ill. Comp. Stat. 130/40; Me. Rev. Stat. tit. 22, § 2423-E; Minn. Stat. § 152.32; Nev. Rev. Stat. § 453A.800; 35 Pa. Stat. Ann. § 10231.2103; R.I. Gen. Laws § 21-28.6-4. The *Noffsinger* decision also emphasized that in *Gersten v. Sun Pain Mgmt., P.L.L.C.*, 395 P.3d at 312–13, the Arizona Court of Appeals "insinuated (but did not find) that a private cause of action might exist against . . . employers" in the AMMA. *Id.* at 339 n. 5.

- 18 -

action is inconsistent "with the underlying purposes of the legislative scheme." *Id.* at 339–40. The court further noted that, "without a private cause of action, § 21a-408p(b)(3) would have no practical effect, because the law does not provide for any other enforcement mechanism." *Id.* at 340.

Similar to Connecticut, Delaware also has an anti-discrimination provision in its Medical Marijuana Act which is almost identical to § 36–2813(B) of the AMMA:

> Unless a failure to do so would cause the employer to lose a monetary or licensing-related benefit under federal law or federal regulations, an employer may not discriminate against a person in hiring, termination, or any term or condition of employment, or otherwise penalize a person, if the discrimination is based upon . . . [a] registered qualifying patient's positive drug test for marijuana components or metabolites, unless the patient used, possessed, or was impaired by marijuana on the premises of the place of employment or during the hours of employment.

Del. Code Ann. tit. 16, § 4905A(a)(3). Notably, a Delaware Superior Court in and for Kent County recently determined that the language of § 4905A(a)(3) creates an implied private right of action. *See Chance v. Kraft Heinz Foods Co.*, No. CV-K18C-01-056 NEP, 2018 WL 6655670, at *6 (Del. Super. Ct. Dec. 17, 2018). In coming to this decision, the superior court noted that the plaintiff, a medical marijuana cardholder who was terminated for failing a drug test, clearly "falls within the class of persons for whose especial benefit the statute was enacted[.]" *Id.* at *5. Further, the court determined that recognizing an implied private right of action would advance the purpose of § 4905A(a)(3) by protecting medical marijuana patients from "discrimination based upon their status, and from being penalized based upon that discrimination, as with termination from employment." *Id.* Finally, the court found that the fact that the state's medical marijuana act included an anti-discrimination provision—but did not task any agency or commission with its enforcement—demonstrated legislative intent to remedy discrimination against registered cardholders through private rights of action. *Id.* at *6.

In light of the similarity between the anti-discrimination provisions at issue in *Noffsinger* and *Chance* to A.R.S. § 36-2813(B), the Court finds these cases highly persuasive. As in *Noffsinger* and *Chance*, Plaintiff is a qualifying patient who "falls within the class for whose benefit" the AMMA was enacted. *Noffsinger*, 273 F. Supp. 3d at 339; *Chance*, 2018 WL 6655670, at *5; *see also Picht*, 641 F. Supp. 2d at 899 ("Whether the statute especially benefits the person seeking redress is a factor in the determination" of whether a statute implicitly creates a private right of action) (citing *Transamerica Financial Corp.*, 761 P.2d at 1021). In consideration of H.B. 2541's modifications to the DTEA intended to protect employers from litigation, it is clear that the Arizona Legislature believed employers had exposure to private lawsuits for violations of § 36–2813(B) of the AMMA. *See* Arizona Senate Fact Sheet, 2011 Reg. Sess., H.B. 2541 (Mar. 25, 2011). This suggests that "there is no indication of legislative intent to deny a private cause of action," as legislators expected the employment provision of the AMMA to "provide protections for employees that would be enforceable in courts." *Noffsinger*, 273 F. Supp. 3d at 339.

Finally, like in *Noffsinger* and *Chance*, a private cause of action is not inconsistent with the underlying purposes of the AMMA, but rather "effectuates the evident legislative purpose" of preventing discrimination in employment against qualifying patients using medical marijuana outside of the workplace since the law lacks any explicit enforcement mechanism. *Id.* at 340; *Chance*, 2018 WL 6655670, at *5–6; *see also Callaghan*, 2017 WL 2321181, at *2, *5–8 (holding that the anti-discrimination provision of Rhode Island's medical marijuana act, R.I. Gen. Laws § 21-28.6-4(d), which provides that "No school, employer, or landlord may refuse to enroll, employ, or lease to, or otherwise penalize, a person solely for his or her status as a cardholder," includes an implied private right of action because "[w]ithout one, § 21-28.6-4(d) would be meaningless"). Following *Noffsinger* and *Chase*, the Court concludes that there is an implied private cause of action for violations of § 36–2813(B) of the AMMA.[12]

---

[12] The Court is not convinced by Defendant's argument that *Noffsinger* is distinguishable because it is a "failure-to-hire" case. (Doc. 37 at 3). The anti-

As the Court finds that there is an implied private cause of action in A.R.S. § 36-2813(B) of the AMMA, the Court will not consider the parties' arguments as to whether or not the AMMA supplies the public policy for Plaintiff's AEPA claim. (*See* Docs. 32 at 10; 35 at 7–8; 37 at 4). Further, the first count in Plaintiff's Complaint (alleging that Defendant wrongfully terminated her in violation of the AEPA by firing her because of her positive drug screen in violation of the public policy set forth in the AMMA) relies on the same set of facts as Plaintiff's second count alleging discrimination under the AMMA. (*See* Doc. 1 at 4–5). Accordingly, since Plaintiff may proceed under her second count alleging discrimination under the AMMA, the Court dismisses Plaintiff's first count alleging wrongful termination under the AMMA and AEPA as duplicative of her second count.

3.    Plaintiff's Request to Defer Ruling on Summary Judgment under Fed. R. Civ. P. 56(d)

Defendant argues in its Motion for Summary Judgment that the results of Plaintiff's May 24, 2016 drug test, which "was positive for marijuana metabolites at a level of greater than 1000 ng/ml, the highest level the test could record," gave Walmart "a good faith basis to believe Plaintiff was impaired by marijuana on May 24, 2016, on Defendant's premises during work hours." (Doc. 32 at 9). However, Plaintiff contends that Defendant previously agreed that impairment was not at issue and that Plaintiff was fired merely because her drug screen indicated the presence of marijuana metabolites— not because she was "impaired" from marijuana. (Doc. 35 at 11). According to Plaintiff, Defendant confirmed via email that it "would not discuss 'levels' of THC, and thus no additional expert testimony was needed" to determine whether or not the level of marijuana metabolites present in Plaintiff's drug screen indicated that she was impaired at work on May 24, 2016. (*Id.*). Because Defendant now presents evidence on impairment despite the alleged email agreement of the parties, Plaintiff requests that the Court defer

---

discrimination provision analyzed in *Noffsinger*, like A.R.S. § 36-2813(B), does not differentiate between refusing to hire or discharging an individual. *See* Conn. Gen. Stat. § 21a-408p(b)(3).

ruling on summary judgment under Fed. R. Civ. P. 56(d) so that she may have the "opportunity to provide actual expert testimony . . . that the presence or level of inactive marijuana metabolites in an individual's urine has no scientific correlation to that individual's impairment." (Doc. 36 at 2).

Fed. R. Civ. P. 56(d) permits the Court to "defer considering the motion or deny it," "allow time to obtain affidavits or declarations or to take discovery," or "issue any other appropriate order" where the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition[.]" Fed. R. Civ. P. 56(d). The rule applies "where the nonmoving party has not had the opportunity to discover information that is essential to its opposition." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) (emphasis added) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n. 5 (1986)). Notably, however, Rule 56(d) "is not meant to re-open discovery in general[.]" *Slama v. City of Madera*, No. 1:08-CV-810 AWI GSA, 2012 WL 1067198, at *2 (E.D. Cal. Mar. 28, 2012); *see also Dumas v. Bangi*, No. 1:12-CV-01355-LJO, 2014 WL 3844775, at *2 (E.D. Cal. Jan. 23, 2014) ("Rule 56(d) does not reopen discovery; rather it forestalls ruling on a motion for summary judgment in cases where discovery is still open and provides the prospect of defeating summary judgment.").

"The party seeking a Rule 56(d) continuance bears the burden of proffering facts sufficient to satisfy the requirements of 56(d)." *Martinez v. Columbia Sportswear USA Corp.*, 553 F. App'x 760, 761 (9th Cir. 2014) (citing *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 921 (9th Cir. 1996)). In ruling on a 56(d) motion, the Court considers whether "the movant diligently pursued its *previous* discovery opportunities," and whether the movant has shown "how allowing *additional* discovery would [] preclude[] summary judgment." *Qualls By & Through Qualls v. Blue Cross of California, Inc.*, 22 F.3d 839, 844 (9th Cir. 1994) (emphasis in original) (citation omitted); *see also Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1005 (9th Cir. 2002) ("The failure to conduct

discovery diligently is grounds for the denial of a Rule 56[(d)] motion.").[13]

Here, Plaintiff produces a Declaration signed by her counsel, Joshua Carden, (Doc. 36-1 at 79–80), and a copy of an email chain with Defendant's counsel, (Doc. 36-1 at 69–71), in support of her position that Defendant previously agreed that the level of THC metabolites in Plaintiff's urine screen and its correlation (or lack thereof) with impairment was not going to be an issue in this suit. (*See id.* at 79).

On December 21, 2017, Plaintiff's counsel emailed counsel for Defendant, stating:

> In light of the recent communications from you that Wal-Mart now claims to have terminated Ms. Whitmire because of the level of THC in her bloodstream versus that she had any level of THC in her urine, I think we will need an expert to render an opinion on the correlation (or lack thereof) between THC and impairment. To that end, are you willing to extend the expert disclosure deadlines solely for that issue? . . . I have located an expert and can probably get a report in 30-45 days or so. Let me know your position as soon as you can please.

(*Id.* at 70).

Defense counsel responded that same day, as follows:

> To make clear, Walmart terminated Ms. Whitmire for testing positive for THC on the drug test she performed. The level of THC the test recorded was not the reason for her termination. With that I do not believe the additional expert witness is necessary.

(*Id.* at 69). Following this response from defense counsel, Plaintiff's counsel asked if Defendant would be "willing to stipulate to limine out any commentary (by either side) on the level of THC itself" and "any testimony related to the THC level having an impact on [Defendant's] decision." (*Id.*). The email chain ends with defense counsel replying

---

[13] In *Pfingston v. Ronan Eng'g Co.*, a case from 2002, the Court refers to the plaintiff's motion for a continuance of the summary judgment motions pending additional discovery as a Rule 56(f) motion. In 2010, Fed. R. Civ. P. 56 was amended, so now "subdivision (d) carries forward without substantial change the provisions of former subdivision (f)." Fed. R. Civ. P. 56 advisory committee's notes to 2000 amendments.

that they would talk with their client and then get back to Plaintiff's counsel. (*Id.*).

Despite the attestation of Plaintiff's counsel that he did not retain an expert on impairment "based on Wal-Mart's assurance that the 'level' of THC metabolites was not going to be an issue," (*id.* at 80), the Court will not preclude Defendant from arguing that Plaintiff was fired because the level of marijuana metabolites present in her drug screen led Defendant to believe she was impaired at work. While it does appear from the December 21, 2017 email chain that Defendant's counsel misled counsel for Plaintiff, Plaintiff's counsel did not reduce this agreement to a formal stipulation, nor use a recognized discovery vehicle to elicit this admission, such as an interrogatory. Therefore, the Court will not bind Defendant to its counsel's responses in the email chain.

Further, as noted in the Rule 16 Scheduling Order, "'last minute' or 'eleventh hour' discovery which results in insufficient time to undertake additional discovery and which requires an extension of the discovery deadline will be met with disfavor, and may result in denial of an extension, exclusion of evidence, or the imposition of other sanctions." (Doc. 13 at 2 n. 2). Both parties here had ample opportunity to retain expert witnesses, depose them, and obtain expert reports within the deadlines set by the Rule 16 Scheduling Order. The parties' failure to disclose experts on the issue of whether Plaintiff's urine screen showed marijuana metabolites present in scientifically sufficient concentration to cause impairment is at their own peril. In light of each party's "failure to conduct discovery diligently," *Pfingston*, 284 F.3d at 1005, the Court denies Plaintiff's request under Fed. R. Civ. P. 56(d). *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 921 (9th Cir. 1996) ("[T]he district court does not abuse its discretion by denying further discovery if the movant has failed diligently to pursue discovery in the past."). Accordingly, the Court will not re-open discovery nor permit Plaintiff (or Defendant) any additional opportunity to obtain further discovery in the form of an expert witness's opinion.

### 4. Evidentiary Objections

In support of its argument that Defendant fired Plaintiff because it had a good faith

basis to believe Plaintiff was impaired by marijuana on May 24, 2016 based on the results of her positive drug test, (Docs. 32 at 9; 33 ¶ 23), Defendant produced a Declaration signed by Personnel Coordinator Debra Vaughn, (Doc. 33-3 at 21–23). This Declaration states, in relevant part:

> 13.    On June 15, 2016, Plaintiff's urinalysis came back positive for marijuana at a level of "> 1000 ng/ml," which I understand to be the maximum reading the test can measure for marijuana.
> 14.    I also understand, upon reasonable belief, that Plaintiff's May 24, 2016, positive test result for marijuana indicated that she was impaired by marijuana during her shift that same day.

(Doc. 33-3 ¶¶ 13–14).

Plaintiff objects to the admissibility of these portions of Ms. Vaughn's Declaration on the ground that paragraphs 13 and 14 of Ms. Vaughn's Declaration constitute improper and undisclosed expert testimony in violation of Federal Rules of Evidence 702 and 703. (Docs. 35 at 11; 36 at 1–2; *see also* Doc. 36 ¶ 23). Plaintiff contends that these portions of Ms. Vaughn's Declaration "were not disclosed to Plaintiff prior to use by Defendant, nor was Ms. Vaughn disclosed as an expert." (Doc. 36 at 1). Plaintiff also objects to Ms. Vaughn's Declaration testimony on the ground that there is "no supporting evidence or foundation" for her statement that the results of Plaintiff's drug test "showed the 'maximum reading the test can measure for marijuana,'" nor any disclosed basis for Ms. Vaughn's belief that Plaintiff's positive drug screen "indicated that she was impaired by marijuana during her shift that same day." (*Id.* at 1). Accordingly, Plaintiff moves for exclusion of these portions of Ms. Vaughn's Declaration testimony. (*Id.* at 2).

Federal Rule of Evidence ("FRE") 702 permits a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to "testify in the form of an opinion or otherwise if . . . the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. District courts are charged with the duty to act as gatekeepers,

as "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *see also Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1396 (D. Or. 1996). A witness not testifying under FRE 702 may offer opinion testimony only if such testimony is "rationally based on the witness's perception," "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

In this case, Defendant has not provided Ms. Vaughn's curriculum vitae nor any indication that Ms. Vaughn has the requisite "knowledge, skill, experience, training, or education" to render opinions regarding the results of Plaintiff's drug test. Fed. R. Evid. 702. Rather, Ms. Vaughn's Declaration indicates she is employed by Defendant as a Personnel Coordinator, which involves "promot[ing], support[ing], and ensur[ing] compliance with Company policies, procedures, mission, values, and standard of ethics and integrity for the Walmart store in Taylor, Arizona." (Doc. 33-3 ¶¶ 2–3). The Court is not satisfied that such a human resource professional is qualified as an expert capable of interpreting Plaintiff's drug test results or at all qualified to render an opinion as to whether the level of metabolites present in Plaintiff's urine screen indicate she was impaired at work on May 24, 2016. Moreover, Ms. Vaughn's opinions are entirely without foundation. She cites to no sources upon which she relied, nor sets forth any basis for her statements from which the Court can determine whether or not her testimony is reliable.

Further, Ms. Vaughn's Declaration testimony that the results of Plaintiff's drug test "showed the 'maximum reading the test can measure for marijuana,'" and that Plaintiff's positive drug screen "indicated that she was impaired by marijuana during her shift that same day," (Doc. 33-3 ¶¶ 13–14), clearly falls within the purview of specialized, scientific knowledge. Defendant "may not attempt to evade FRE 702's requirements 'through the simple expedient of proffering an expert in lay witness

clothing.'" *Montalvo v. Am. Family Mut. Ins. Co.*, No. CV-12-02297-PHX-JAT, 2014 WL 2986678, at *6 (D. Ariz. July 2, 2014) (citing Fed. R. Evid. 701 advisory committee's notes to 2000 amendments). As Ms. Vaughn's Declaration testimony (Doc. 33-3 ¶¶ 13–14) falls within the scope of Fed. R. Evid. 702, Defendant was required to identify Ms. Vaughn as an expert witness pursuant to Fed. R. Civ. P. 26(a)(2)(A), and disclose a written report pursuant to Fed. R. Civ. P. 26(a)(2)(B).[14] Defendant's failure to do so by the deadlines set forth in the Rule 16 Scheduling Order (Doc. 13) is a violation of that Order and of the discovery rules.[15]

When a party fails to make a timely disclosure required by Federal Rule of Civil Procedure 26(a), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "In determining whether this sanction should be imposed, the burden is on the party facing the sanction—i.e., Defendant[]—to demonstrate that the failure to comply with Rule 26(a) is substantially justified or harmless." *Torres v. City of Los Angeles*, 548 F.3d 1197, 1213 (9th Cir. 2008) (citation omitted). Not only has Defendant failed to show that either of these exceptions apply here, but Defendant's failure to disclose Ms. Vaughn as an expert substantially prejudiced Plaintiff by depriving her of the "reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses" on the issue

---

[14] Under Fed. R. Civ. P. 26(a)(2)(A), "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." This expert disclosure "must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case . . . ." Fed. R. Civ. P. 26(a)(2)(B). "A party must make these disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D).

[15] Regardless of which party has the burden of proof on the issue of impairment, Defendant failed to timely disclose Ms. Vaughn as an expert. The Court's Rule 16 Scheduling Order required that the party with the burden of proof on the issue make all expert disclosures "no later than November 17, 2017." (Doc. 13 at 2). Thereafter, the Order required the responding party without the burden of proof on that issue to make any expert disclosures "no later than December 15, 2017." (*Id.*). Then, the party with the burden of proof was required to "make its rebuttal expert disclosure, if any, no later than January 12, 2018." (*Id.*). Further, the Court ordered that all discovery be completed by March 30, 2018, (*id.*) and stressed that it would "not entertain discovery disputes after the close of discovery barring extraordinary circumstances," (*id.* at 2 n. 2).

of whether the level of metabolites present in Plaintiff's drug screen indicate that she was impaired at work on May 24, 2016. *Karl Storz Endoscopy-Am., Inc. v. Stryker Corp.*, No. 14-CV-00876-RS-JSC, 2018 WL 1569762, at *2 (N.D. Cal. Mar. 30, 2018) (citing *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 725 F.3d 1377, 1381 (Fed. Cir. 2013)). Accordingly, the Court has "wide latitude" to "issue sanctions under Rule 37(c)(1)." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001); *see also* Fed. R. Civ. P. 37 advisory committee's notes to 1993 amendments (noting that Fed. R. Civ. P. 37(c) "provides a self-executing," "automatic sanction" for failure to make a disclosure required by Rule 26(a) which "provides a strong inducement for disclosure of material").

The Court concludes that exclusion of Ms. Vaughn's expert testimony in paragraphs 13 and 14 of her Declaration (Doc. 33-3 ¶¶ 13–14) "is an appropriate remedy for failing to fulfill the required disclosure requirements of Rule 26(a)." *Yeti by Molly, Ltd.*, 259 F.3d at 1106. Accordingly, the Court will not consider this testimony in ruling on Defendant's Motion for Summary Judgment (Doc. 32).

In response to Ms. Vaughn's contention that Plaintiff's positive screen for marijuana "indicated that she was impaired by marijuana during her shift that same day," (Doc. 33-3 ¶ 14), Plaintiff introduces rebuttal materials to demonstrate that she was not tested for "marijuana," but rather for "marijuana metabolites," which are "primarily the non-impairing components of THC . . . that metabolize in urine," (Doc. 36 at 1). (*See* Docs. 36 at 1–2; 36-1 at 45–53, 55–58, 60–67). In its Reply, Defendant asks the Court to strike Plaintiff's evidence pertaining to the correlation between THC and impairment. (Doc. 37 at 4). Although Defendant does not state with specificity which particular evidence it wishes the Court to strike, the Court surmises that Defendant is referring to Exhibits H (Doc. 36-1 at 45–53), I (*id.* at 55–58), and J (*id.* at 60–67) to Plaintiff's Controverting Statements of Fact and Additional Statements of Fact (Doc. 36).[16] Because

---

[16] Exhibit H (Doc. 36-1 at 45–53) includes pages from an article entitled "An Evaluation of Data from Drivers Arrested for Driving Under the Influence in Relation to Per se Limits for Cannabis." Exhibit I (*id.* at 55–58) is the Drug Screen Test Cup (Urine) Package Insert from Alere. Exhibit J (*id.* at 60–67) includes pages from an article entitled

the Court is not considering paragraphs 13 and 14 of Ms. Vaughn's Declaration, the Court will also not consider Plaintiff's rebuttal materials—Exhibits H, I and J (Doc. 36-1 at 45–53, 55–58, 60–67)—pertaining to the correlation between THC and impairment in ruling on Defendant's Motion for Summary Judgment (Doc. 32).

### 5. The "Safety-Sensitive" Position Exception

On pages 9–11 of her Response, Plaintiff argues that the "safety-sensitive" exception of A.R.S. § 23-493.06(7) of the DTEA is not supported by the law or the evidence on the grounds that Defendant already conceded that Plaintiff's position was not "safety-sensitive," and because the "safety-sensitive" exception unconstitutionally amended the AMMA. (Doc. 35 at 9–11). However, in its Order dated August 22, 2018, the Court explicitly precluded any argument by Defendant that Plaintiff was in a safety sensitive position. (Doc. 31). Accordingly, whether or not Plaintiff was in a "safety-sensitive" position is not at issue in this case. Therefore, the Court will not consider Plaintiff's arguments on pages 9 through 11 of her Response as they are irrelevant.

### 6. Whether Sections 23-493(6) and 23-493.06(A)(6) of the DTEA Unconstitutionally Amended the AMMA

A.R.S. § 36-2813(B)(2) provides that "an employer may not discriminate against a person in hiring, termination or imposing any term or condition of employment or otherwise penalize a person based upon . . . [a] registered qualifying patient's positive drug test for marijuana components or metabolites, unless the patient used, possessed or was impaired by marijuana on the premises of the place of employment or during the hours of employment." While the AMMA does not "prohibit[] an employer from disciplining an employee for . . . working while under the influence of marijuana," *id.* § 36-2814(B), "a registered qualifying patient shall not be considered to be under the influence of marijuana *solely because of the presence of metabolites or components of marijuana that appear in insufficient concentration to cause impairment*," *id.* § 36-2814(A)(3) (emphasis added). Another Arizona statute, the Drug Testing of Employees

"Marijuana and the Cannabinoids."

Act ("DTEA") provides, in relevant part, that:

> No cause of action is or may be established for any person against an employer who has established a policy and initiated a testing program in accordance with this article for . . . [a]ctions based on the employer's *good faith belief* that an employee had an *impairment* while working while on the employer's premises or during hours of employment.

*Id.* § 23-493.06(A)(6) (emphasis added). The DTEA further states that such a "good faith belief may be based on" any number of things, including the "[r]esults of a test for the use of alcohol or drugs." *Id.* § 23-493(6).

In its November 21, 2018 Order (Doc. 44), the Court asked the parties to provide supplemental briefing discussing whether sections 23-493(6) and 23-493.06(A)(6) of the DTEA implicitly amended or repealed sections 36-2813(B)(2) and 36-2814(A)(3) of the AMMA in violation of the Voter Protection Act, Ariz. Const. art. IV, Pt. 1 § 1. After reviewing the parties' briefs, (Doc. 48; Doc. 49), and the State of Arizona's *Amicus Curiae* Brief In Support of No Party (Doc. 54-1 at 1–5), the Court finds there is no conflict between the AMMA and DTEA provisions at issue.

Arizona voters enacted the AMMA by ballot initiative in the November 2010 general election, *Gear*, 372 P.3d at 288, while sections 23-493(6) and 23-493.06(A)(6) of the DTEA were enacted by the Arizona Legislature in April 2011 via H.B. 2541. *See* Arizona Senate Fact Sheet, 2011 Reg. Sess., H.B. 2541 (Mar. 25, 2011). Under the Voter Protection Act, the legislature cannot repeal an initiative-enacted law, and may only modify it by a three-fourths vote when the change furthers the law's purpose. Ariz. Const. art. IV, Pt. 1 § 1(6)(B)–(C). "[A] statute can be implicitly repealed or amended by another through 'repugnancy' or 'inconsistency.'" *Cave Creek Unified Sch. Dist. v. Ducey*, 308 P.3d 1152, 1158 (Ariz. 2013) (citations omitted). However, "[w]henever possible[,]" Arizona courts "adopt a construction of a statute that reconciles it with other statutes, giving force to all statutes involved." *Lewis v. Arizona Dep't of Econ. Sec.*, 925 P.2d 751, 755 (Ariz. Ct. App. 1996) (citation omitted). "Although the finding of an

implied repeal or amendment is generally disfavored, it is required when conflicting statutes cannot be harmonized to give each effect and meaning." *Cave Creek Unified Sch. Dist.*, 308 P.3d at 1158 (citations omitted).

Here, however, sections 23-493(6) and 23-493.06(A)(6) of the DTEA and sections 36-2813(B)(2) and 36-2814(A)(3) of the AMMA can be harmonized. The Court finds the reasoning set forth by the State of Arizona in its *amicus* brief particularly compelling, and adopts it as its own:

> Here, the AMMA and DTEA provisions at issue work hand-in-hand. The AMMA provisions are framed in negative terms: an employer *may not* fire an employee based on a positive drug test for marijuana components or metabolites, unless she used, possessed, or was impaired by marijuana at work, A.R.S. § 36-2813(B)(1)–(2), and "a registered qualifying patient *shall not* be considered to be under the influence of marijuana solely because of the presence of metabolites or components of marijuana that appear in insufficient concentration to cause impairment," *id.* § 36-2814(A)(3) (emphasis added). But the positive implications of these AMMA provisions are clear: an employee *may* be fired based on her positive drug test for "metabolites or components of marijuana" if she possessed, used, or was impaired by marijuana at work, *see id.* § 36-2813(B)(1)–(2), and a registered qualifying patient *may* be considered to be under the influence of marijuana based solely on the presence of "metabolites or components of marijuana" that appear in *sufficient* concentration to cause impairment, *see id.* § 36-2814(A)(3). The DTEA's implications are also clear: an employer is shielded from liability for firing an employee based on the employer's good-faith belief that the employee was impaired while working, *id.* § 23-493.06(6), and that good-faith belief may be based on the results of a drug test, *id.* § 23-493(6)(f).
>
> As relevant here, the AMMA and DTEA provisions can and should be read together as follows: an employer cannot be sued for firing a registered qualifying patient based on the employer's good-faith belief that the employee was impaired by marijuana at work, where that belief is based on a drug test sufficiently establishing the presence of "metabolites or components of marijuana" sufficient to cause

impairment.

(Doc. 54-1 at 4–5).

Accordingly, the Court finds that sections 23-493(6) and 23-493.06(A)(6) of the DTEA did not unconstitutionally amend the AMMA.

### 7. Whether a Genuine Dispute of Material Fact Exists

Plaintiff claims that Defendant discriminated against her in violation of the AMMA, A.R.S. § 36-2813(B), by suspending her without pay and then terminating her because of her positive drug test without a showing of impairment. (Doc. 1 at 4–5, 7). It is undisputed that Plaintiff, a qualified registered patient under the AMMA, smoked marijuana just before 2:00 a.m. on May 24, 2016 prior to going to sleep, and then clocked in to her scheduled shift at 2:00 p.m. later that same day. (Docs. 33 ¶¶ 12–13, 19–21; 36 ¶¶ 12–13, 19–21; 36-1 ¶ 18). It is also undisputed that the only reason given to Plaintiff for her suspension and termination was her positive drug test. (Docs. 33 ¶¶ 25–26; 36 ¶¶ 25–26; *see also* Doc. 33-3 at 35). Defendant claims that the results of this drug screen, which "was positive for marijuana metabolites at a level of greater than 1000 ng/ml, the highest level the test could record," gave Walmart "a good faith basis to believe Plaintiff was impaired by marijuana on May 24, 2016, on Defendant's premises during work hours, and Walmart terminated Plaintiff's employment *solely on that basis*." (Doc. 32 at 9) (emphasis added). Defendant argues as an affirmative defense that it is protected from litigation because "it has established a policy and implemented a drug testing program" in compliance with A.R.S. § 23-493.06 of the DTEA. (Docs. 6 at 9; 32 at 9, 15). Section 23-493.06 exempts an employer from liability for "actions based on the employer's good faith[17] belief that an employee had an impairment[18] while working while on the

---

[17] Under the DTEA, "good faith" is defined as "reasonable reliance on fact, or that which is held out to be factual, without the intent to deceive or be deceived and without reckless or malicious disregard for the truth." A.R.S. § 23-493(6).

[18] The DTEA defines "impairment" as:

> . . . symptoms that a prospective employee or employee while working may be under the influence of drugs or alcohol

- 32 -

employer's premises or during hours of employment." A.R.S. § 23-493.06(A)(6). Under the DTEA, such a "good faith belief may be based on" the "[r]esults of a test for the use of alcohol or drugs." *Id.* § 23-493(6).

The AMMA makes clear that while an employer may discipline an employee for working while under the influence of marijuana, *id.* § 36-2814(B), "a registered qualifying patient shall not be considered to be under the influence of marijuana *solely because of the presence of metabolites or components of marijuana that appear in insufficient concentration to cause impairment*," *id.* § 36-2814(A)(3) (emphasis added). Reading the DTEA and AMMA in harmony, an employer cannot be sued for suspending or firing a registered qualifying patient based on the employer's good faith belief that the employee was impaired by marijuana at work, where that belief is based on a drug test which establishes the presence of metabolites or components of marijuana *in sufficient concentration to cause impairment*. *Id.* §§ 23-493(6), 23-493.06(A)(6), 36-2813(B)(2), 36-2814(A)(3). At issue in this case is whether Plaintiff's positive drug screen is alone sufficient to support Defendant's "good faith belief" that Plaintiff was impaired by marijuana at work on May 24, 2016 in the absence of any other evidence of impairment or any expert testimony establishing that the level of metabolites present in Plaintiff's drug screen demonstrates that marijuana was present in her system in a sufficient concentration to cause impairment.[19]

---

that may decrease or lessen the employee's performance of the duties or tasks of the employee's job position, including symptoms of the employee's speech, walking, standing, physical dexterity, agility, coordination, actions, movement, demeanor, appearance, clothing, odor, irrational or unusual behavior, negligence or carelessness in operating equipment, machinery or production or manufacturing processes, disregard for the safety of the employee or others, involvement in an accident that results in serious damage to equipment, machinery or property, disruption of a production or manufacturing process, any injury to the employee or others or other symptoms causing a reasonable suspicion of the use of drugs or alcohol.

*Id.* at § 23-493(7).

[19] The Court has not overlooked the fact that impairment can be proven in any

In presenting its affirmative defense under the DTEA, Defendant bears the burden of proving that it had a good faith belief that Plaintiff was impaired by marijuana at work. *See id.* §§ 23-493(6), 23-493.06(A)(6). Thus, Defendant initially bears the burden of showing that Plaintiff's drug screen sufficiently establishes the presence of metabolites or components of marijuana in a scientifically sufficient concentration to cause impairment.[20] Defendant is unable to meet that burden.

Defendant claims that its "good faith belief cannot be supported or controverted by any expert witness testimony as it is a fact question solely based on the test result." (Doc. 37 at 5). According to Defendant, it "does not need to argue[] that any particular numerical reading indicates 'impairment,'" and "does not need expert witness testimony to correlate a specific numerical reading to 'impairment.'" (Doc. 48 at 8). Rather, Defendant believes Plaintiff's positive drug screen sufficiently supports its good faith belief that Plaintiff was impaired at work because "the positive reading was 'so positive' that it was above what the test could measure (that is, above 1000 ng/ml)." (*Id.*). In opposition, Plaintiff disputes Defendant's "good faith belief" on the ground that it is an unreasonable belief to hold in light of Arizona case law discussing the relationship between marijuana metabolites and impairment. (Doc. 35 at 12–13 ("the 'level' shown in a urine test cannot serve as a good faith basis for 'deeming' someone impaired") (citing *State v. Hammonds*, 968 P.2d 601, 603 (Ariz. Ct. App. 1998) ("At the metabolite stage, the metabolic component detected in the urine is 'inactive,' in the sense that it is incapable of causing impairment. Many drugs will continue to appear in the urine in

---

number of ways. *See* A.R.S. § 23-493(7). However, as Defendant itself admitted, Walmart terminated Plaintiff solely based on the results of her drug screen. (*See* Doc. 32 at 9 ("The results of this test gave Defendant a good faith basis to believe Plaintiff was impaired by marijuana on May 24, 2016, on Defendant's premises during work hours, and Walmart terminated Plaintiff's employment *solely on that basis*.") (emphasis added)).

[20] In its Supplemental Brief, Defendant agrees that the burden of showing a "good faith belief" is placed on the employer, and then shifts to the employee. (*See* Doc. 48 at 4 (". . . Walmart must show it had a good faith belief that Plaintiff was 'impaired by' or 'under the influence of' marijuana while at work and, if it d[oes], it is Plaintiff's burden to show the lack of such a good faith belief.")).

metabolite form for days or even weeks after use. A urine test, while indicative of what has been in the bloodstream in the past, says nothing conclusive about what is presently in the bloodstream.")).[21]

While the Court draws no conclusion as to whether a drug screen is itself capable of demonstrating whether someone was impaired based on this case law cited by Plaintiff, it is clear to the Court that proving impairment based on the results of a drug screen is a scientific matter which requires expert testimony. Without expert testimony establishing that Plaintiff's drug screen shows marijuana metabolites or components in a sufficient concentration to cause impairment, Defendant is unable to prove that Plaintiff's drug screen gave it a "good faith basis" to believe Plaintiff was impaired at work on May 24, 2016. Accordingly, Defendant's affirmative defense under § 23-493.06(A)(6) of the DTEA fails. Therefore, the Court denies Defendant's Motion for Summary Judgment as to the second count in Plaintiff's Complaint alleging discrimination under the AMMA.

It is undisputed that Plaintiff, a registered qualifying patient, was suspended and ultimately terminated because of her positive urine screen showing the presence of marijuana metabolites. Defendant claims: "[u]nder Walmart policy, Plaintiff was terminated for testing positive for marijuana, which is a legitimate reason for termination, even under the AMMA." (Doc. 32 at 14). According to Defendant, "Walmart has a policy of terminating Associates if they test positive for marijuana while on Walmart's premises or during working hours *regardless of whether the employee possesses a medical marijuana card and regardless of the level of marijuana detected*." (Doc. 33-3 at 22, Decl. of Debra Vaughn ¶ 6) (emphasis added). However, as Plaintiff points out, terminating a registered qualifying patient who tests positive for marijuana "regardless of whether the employee possesses a medical marijuana card and regardless of the level of marijuana detected" constitutes a "complete and 'bright line' disregard for the Arizona

---

[21] The Arizona Supreme Court has also recognized the distinction between active and inactive marijuana metabolites. *See State ex rel. Montgomery v. Harris*, 322 P.3d 160, 164 (Ariz. 2014) ("Because the legislature intended to prevent impaired driving, we hold that the 'metabolite' reference in § 28–1381(A)(3) is limited to any of a proscribed substance's metabolites that are capable of causing impairment.").

Medical Marijuana Act's antidiscrimination provisions[.]" (Doc. 35 at 1). Indeed, section 36-2813(B)(2) of the AMMA protects qualifying registered patients, like Plaintiff, who merely test positive for marijuana metabolites. Without any evidence that Plaintiff "used, possessed or was impaired by marijuana" at work on May 24, 2016, it is clear that Defendant discriminated against Plaintiff in violation of A.R.S. § 36-2813(B)(2) of the AMMA by suspending and then terminating Plaintiff solely based on her positive drug screen.[22] *See* A.R.S. § 36-2813(B)(2) ("[A]n employer may not discriminate against a person in hiring, termination or imposing any term or condition of employment or otherwise penalize a person based upon . . . [a] registered qualifying patient's positive drug test for marijuana components or metabolites, *unless the patient used, possessed or was impaired by marijuana* on the premises of the place of employment or during the hours of employment.") (emphasis added). Accordingly, no genuine dispute of material fact remains for trial.

Fed. R. Civ. P. 56(f) provides that the court may "grant summary judgment for a nonmovant[,]" grant a summary judgment motion "on grounds not raised by a party[,]" or "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute[]" so long as the court gives "notice and a reasonable time to respond" prior to doing so. "[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex Corp.*, 477 U.S. at 326; *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 971 (9th Cir. 2010) ("District courts unquestionably possess the power to enter summary judgment *sua sponte*, even on the eve of trial."). "Reasonable notice implies adequate time to develop the facts on which the litigant will depend to oppose summary judgment." *Norse*, 629 F.3d at 972 (quoting *Portsmouth Square, Inc. v. S'holders Protective Comm.*, 770 F.2d 866, 869 (9th Cir. 1985)). However, it is well settled that "[a] district court may grant

---

[22] Defendant nowhere contends that Plaintiff "used" or "possessed" marijuana while at work. Rather, Defendant's defense rests on its claim that Plaintiff was "impaired" by marijuana at work, of which there is no evidence.

summary judgment without notice if the losing party has had a full and fair opportunity to ventilate the issues involved in the motion." *In re Harris Pine Mills*, 44 F.3d 1431, 1439 (9th Cir. 1995) (quoting *United States v. Grayson*, 879 F.2d 620, 625 (9th Cir. 1989)).

Here, the parties had notice and a reasonable opportunity to present their respective evidence on the question of liability under the AMMA's anti-discrimination provision. In November, the Court issued an Order which asked the parties to provide supplemental briefing discussing, in part, why Plaintiff should or should not be entitled to summary judgment on her claim under the AMMA pursuant to Rule 56(f). (Doc. 44 at 4). In this Order, the Court stated that "there is no evidence indicating that Plaintiff was impaired at work or expert testimony establishing that the level of metabolites present in Plaintiff's positive drug screen demonstrates that marijuana was present in her system in a sufficient concentration to cause impairment." (*Id.* at 3). Despite this admonition, Defendant still did not come forward with any evidence establishing that Plaintiff was impaired in its Supplemental Brief. (*See* Doc. 48). Sections 36-2813(B)(2) and 36-2814(A)(3) of the AMMA grant Plaintiff protection against suspension and termination for merely testing positive for marijuana metabolites. In the absence of any expert testimony or evidence demonstrating impairment, the Court will, pursuant to Rule 56(f), *sua sponte* grant summary judgment in part to Plaintiff solely on the question of liability on the Second Count of her Complaint alleging discrimination under the AMMA.

## B.     Wrongful Termination under the ACRA

The third count in Plaintiff's Complaint alleges that she was wrongfully terminated on the basis of disability in violation of the ACRA, A.R.S. § 41-1463(B). (Doc. 1 at 5). This portion of the ACRA provides that it "is an unlawful employment practice for an employer" to "discharge any individual[23] or otherwise to discriminate against any individual with respect to the individual's compensation, terms, conditions or privileges of employment . . . on the basis of disability." A.R.S. § 41-1463(B)(1). Notably, the "ADA standards for disability discrimination claims apply to similar claims

---

[23] The ACRA clarifies that "with respect to employers or employment practices involving a disability, 'individual,' means a qualified individual." A.R.S. § 41-1463(O).

brought under the Arizona Civil Rights Act ("ACRA"), A.R.S. § 41–1463, as the ACRA is modeled after federal employment discrimination laws." *Larson v. United Nat. Foods W., Inc.*, No. CV-10-185-PHX-DGC, 2011 WL 3267316, at *3 (D. Ariz. July 29, 2011) (citing *Nelson v. Cyprus Bagdad Copper Corp.*, 119 F.3d 756, 762 (9th Cir. 1997); *April v. U.S. Airways, Inc.*, No. CV–09–1707–PHX–LOA, 2011 WL 488893, at *10 (D.Ariz. Feb.7, 2011)); *see also Ransom v. State of Arizona Bd. of Regents*, 983 F. Supp. 895, 904 (D. Ariz. 1997) ("This Court finds federal case law to be persuasive in interpreting the ACRA because of the similarities between it and the federal antidiscrimination laws."); *Francini v. Phoenix Newspapers, Inc.*, 937 P.2d 1382, 1388 (Ariz. Ct. App. 1996) ("Because the ACRA is modeled after federal employment discrimination laws . . . federal case law is persuasive in applying the ACRA.").

In order to establish a *prima facie* case of disability discrimination under the ACRA, Plaintiff must demonstrate: (1) that she is disabled, (2) that she is qualified to perform the essential functions of her job with or without a reasonable accommodation, and (3) that she was discharged because of her disability. *Fallar v. Compuware Corp.*, 202 F. Supp. 2d 1067, 1082 (D. Ariz. 2002); *Ransom*, 983 F. Supp. at 904. Should Plaintiff establish a *prima facie* case, then the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for its employment action. *Fallar*, 202 F. Supp. 2d at 1082. If Defendant sets forth such a reason, then Plaintiff must show that Defendant's proffered reason is merely pretext for unlawful disability discrimination. *Id.*; *see also Burris v. City of Phoenix*, 875 P.2d 1340, 1346 (Ariz. Ct. App. 1993) (applying the *McDonnell Douglas* burden-shifting framework to a discriminatory termination claim under A.R.S. § 41-1463 of the ACRA).

### 1. Whether Plaintiff is "Disabled"

Defendant contends that Plaintiff cannot establish the first element of her *prima facie* case because she is not disabled. (Doc. 32 at 11). The ACRA requires that the term "disability" be defined and construed "in favor of broad coverage of individuals." A.R.S. § 41-1468(A). Under the ACRA:

Disability means, with respect to an individual, *except any impairment caused by current use of illegal drugs*, any of the following:

(a) A physical or mental impairment that substantially limits one or more of the major life activities of the individual.

(b) A record of such a physical or mental impairment.

(c) Being regarded as having such a physical or mental impairment.

*Id.* § 41-1461(4) (emphasis added).

The employee "bears the ultimate burden of proving" that she is disabled. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 988 (9th Cir. 2007) (citing *Nunes v. Wal–Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999)). "Therefore, for summary judgment to be appropriate, there must be no genuine issue of material fact regarding whether [the plaintiff] has an impairment that substantially limits a major life activity, has a record of such an impairment, or is regarded as having such an impairment." *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 884 (9th Cir. 2004).

According to Defendant, "Plaintiff does not identify or describe her purported disability anywhere in her Complaint," nor "provide[] any information about any purported disability." (Doc. 32 at 11). Rather, Defendant states that Plaintiff "seems to imply that she is 'disabled' because she qualifies for a medical marijuana card." (*Id.*). To the extent that Plaintiff may be attempting to imply that her "disability" is "her status as a medical marijuana cardholder," as Defendant suggests, (*id.*), Plaintiff's argument fails because Plaintiff admitted that "she has no evidence that Walmart terminated her because of her status as a medical marijuana cardholder." (Doc. 36 ¶ 33).

In both her Complaint and Response, Plaintiff does not aver any facts suggesting that any of her major life activities have been limited or that she has a record of an impairment. (*See* Doc. 1, 35). Rather, Plaintiff alleges that she is disabled under the ACRA "because she was 'regarded as' being impaired by Wal-Mart." (Doc. 35 at 13). In her Response, Plaintiff nowhere specifies whether Defendant viewed her as impaired

because of her marijuana use, because of her on-the-job wrist injury, or because of the underlying medical conditions[24] that she treats with medical marijuana. (*See* Doc. 35). Although the Court agrees with Defendant that it is "far from clear" (Doc. 37 at 8) from Plaintiff's Response, Plaintiff clarified at oral argument that she is alleging that Defendant regarded her as having an impairment because of the effects of her medical marijuana use.

The ACRA defines "[b]eing regarded as having such a physical or mental impairment" as an individual who establishes that he or she "has been subjected to an action prohibited under this article because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." A.R.S. § 41-1461(2). Notably, however, the impairment must not be "transitory" or "minor." A.R.S. § 41-1461(2)(b).[25] A "transitory impairment" is "an impairment with an actual or expected duration of six months or less." *Id.*

Here, Plaintiff's alleged impairment—the effects of medical marijuana use—appears to be objectively "transitory and minor," and thus bars Plaintiff from meeting the ACRA's definition of disabled. *Id.* In Plaintiff's Controverting Statements of Fact and Additional Statements of Fact, she states that she "smokes the medical marijuana in the evening just before bed in order to be able to sleep," and "strongly prefers the medical marijuana over the hydrocodone because she has zero side effects when she wakes up, while the hydrocodone makes her groggy and feel 'not there' in the mornings." (Doc. 36 ¶¶ 36–37). Further, she asserts that she "did not come to work until 12 hours past her last use of medical marijuana" on the day she was drug-tested, and states that she has "never . . . been impaired by [marijuana] during her hours of employment." (*Id.* ¶¶ 38, 68). Moreover, Plaintiff points out that there "is no allegation or evidence in this case that Ms. Whitmire was observed to be impaired at work." (*Id.* ¶ 69). In light of these facts

---

[24] (*See* Doc. 36 ¶¶ 34–36, 39–40).

[25] Under the ADA, the "relevant inquiry is whether the actual or perceived impairment is objectively 'transitory and minor,' not whether the employer subjectively believed the impairment to be transitory and minor." *Saley v. Caney Fork, LLC*, 886 F. Supp. 2d 837, 851 (M.D. Tenn. 2012) (citing 29 C.F.R. § 1630.2(l)).

averred by Plaintiff which demonstrate that she believes the impairing effects of marijuana subside in a period of hours, the Court suspects that a reasonable jury would not be convinced that smoking medical marijuana gave Plaintiff a physical or mental impairment with an actual or expected duration of more than six months, as required to meet the definition of "disabled" under A.R.S. § 41-1461(2)(b).

Putting aside the issue of whether the reference to "impairment caused by current use of illegal drugs" in A.R.S. § 41-1461(4) includes impairment caused by medical marijuana use, case law from the Third and Seventh Circuits suggests that "if one can alter or remove the 'impairment' through an equally efficacious course of treatment, it should not be considered 'disabling.'" *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 187 (3d Cir. 2010). In *Sulima*, the Court stated that the "side effects from medical treatments may themselves constitute an impairment under the ADA," where the potentially disabling medication or course of treatment is "required in the 'prudent judgment of the medical profession,'" and where there are no "available alternative[s] that [are] equally efficacious [but] lack[] similarly disabling side effects." *Id.* at 187 (holding that employee's claimed impairment based on side effects from prescribed medication for his gastrointestinal problems did not constitute a "disability" within the meaning of the ADA, regardless of whether his underlying health problems were disabling, because employee did not demonstrate that the prescribed medication was required in the prudent judgment of the medical profession) (citing *Christian v. St. Anthony Med. Ctr., Inc.*, 117 F.3d 1051, 1052 (7th Cir. 1997) (stating that "the disabling treatment [must] be truly necessary, and not merely an attractive option"); *Hill v. Kansas City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999) (finding no evidence in the record that the plaintiff's "physical condition *compelled* her to take a combination of medications [that caused the side effects]" (emphasis in original))).

Applying this standard here, Plaintiff clearly has not shown that smoking medical marijuana, the "potentially disabling medication" at issue, is "required in the prudent judgment of the medical profession." *Sulima*, 602 F.3d at 187. Rather, marijuana is still

classified as a Schedule 1 controlled substance under the Controlled Substances Act, meaning it "has a high potential for abuse," and "has no currently accepted medical use in treatment in the United States." 21 U.S.C. § 812(b)(1). Although Plaintiff avers that she prefers medical marijuana to hydrocodone because the "hydrocodone makes her groggy and feel 'not there' in the mornings," (Doc. 36 ¶ 37), Plaintiff has also not demonstrated that no other equally effective alternatives exist which lack the side-effects that medical marijuana has, *Sulima*, 602 F.3d at 187. Rather, Plaintiff could likely use another pain medication which might not have the same "impairing" effects as medical marijuana or hydrocodone.[26] Following the precedents set by the Third Circuit in *Sulima* and by the Seventh Circuit in *Christian*, the Court cannot find that the side effects from smoking medical marijuana constitute a disability under the ACRA. As Plaintiff has failed to demonstrate that she has a disability, she is unable to meet the first element of her *prima facie* case. This, alone, is sufficient to grant summary judgment to Defendant on Plaintiff's wrongful termination claim under the ACRA.

Because Plaintiff failed to prove that she is disabled under the ACRA and is therefore unable to meet her *prima facie* case, the Court need not address the parties' arguments as to whether Plaintiff is a "qualified individual" or whether she was discharged "because of" her disability. *See Ransom*, 983 F. Supp. at 905 ("Plaintiff bears the burden of proof for establishing *each* of the[] elements" of her prima facie case.) (emphasis added). Further, Plaintiff's failure to meet her *prima facie* burden renders moot

---

[26] *See McDonald v. Pennsylvania State Police*, No. 02:09-CV-00442, 2012 WL 5381403, at *11 (W.D. Pa. Oct. 31, 2012) (holding that the side effects of the plaintiff's prescribed pain medication did not constitute an actual disability nor lead plaintiff to be "regarded as" disabled where the plaintiff could have switched to a non-narcotic pain reliever or stopped taking the pain medication altogether, and where the plaintiff failed to meet his burden of demonstrating that his prescribed pain medication was the "only efficacious medication" and medically necessary); *Tavarez v. United Blood Servs.*, No. 11-CV-673 WJ/ACT, 2012 WL 13080075, at *6 (D.N.M. July 12, 2012) (holding that the side effects of the plaintiff's pain medication did not qualify as a disability under the ADA where the plaintiff did not claim that such side effects were a permanent condition, did not make any showing that she discussed the possibility of an alternative pain medication with her doctor, and where plaintiff discontinued use of the medication, showing "that it was not required").

the remainder of the burden-shifting analysis.[27] In sum, the Court finds that Plaintiff has not introduced evidence sufficient to raise a genuine dispute of material fact that Defendant discriminated against her because of a disability. Accordingly, the Court grants Defendant's Motion with respect to Plaintiff's third cause of action alleging disability discrimination under the ACRA.

### C.    Retaliatory Termination under the AEPA and Arizona Workers' Compensation Statutes

The fourth and final count in Plaintiff's Complaint alleges that Defendant retaliated against her for pursuing her rights under Arizona's workers' compensation statutes in violation of the AEPA, A.R.S. § 23-1501(A)(3)(c)(iii). (Doc. 1 at 5–6). This section of the AEPA provides that it is the "public policy of this state" that an "employee has a claim against an employer for termination of employment" if the "employer has terminated the employment relationship of an employee in retaliation" for the "exercise of rights under the workers' compensation statutes[.]" A.R.S. § 23-1501(A)(3)(c)(iii); *see also Thompson v. Better-Bilt Aluminum Prod. Co.*, 927 P.2d 781, 787 (Ariz. Ct. App. 1996) ("Termination in retaliation for filing a workers' compensation claim can serve as the basis for a cause of action for wrongful discharge.").

In order to establish a *prima facie* case of retaliation under the AEPA, Plaintiff must show: "(1) that [s]he engaged in a protected activity, (2) that [s]he suffered an adverse employment action, and (3) that there is a causal link between the two." *Levine v. TERROS, Inc.*, No. CV08-1458-PHX-MHM, 2010 WL 864498, at *8–10 (D. Ariz. Mar. 9, 2010) (citing *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1113 (9th Cir. 2003)); *see also Burroughs v. City of Tucson*, No. CV-16-00724-TUC-BGM, 2018 WL 5044653, at *13 (D. Ariz. Oct. 17, 2018); *Love v. Phelps Dodge Bagdad, Inc.*, No. CV-03-01399-PCT-MHM, 2005 WL 2416363, at *10 (D. Ariz. Sept. 26, 2005). "Under the

---

[27] Despite recognizing that "the *McDonnell Douglas* burden-shifting framework applies to her ACRA claim," (Doc. 35 at 13), Plaintiff failed to make any argument contending that Defendant's proffered reasons for her termination were pretext for disability discrimination. (*See* Doc. 35). Accordingly, even if Plaintiff had met her *prima facie* burden, Plaintiff's wrongful termination claim under the ACRA still would not survive summary judgment.

AEPA the filing of a workers' compensation claim is a protected activity." *Levine*, 2010 WL 864498, at \*14 (citing A.R.S. § 23–1501(A)(3)(c)(iii)).

The parties here do not dispute that Plaintiff suffered an adverse employment action, (*see* Docs. 32 at 11 n. 2, 13–14; 35 at 14–17), as she was terminated, (Doc. 1 at 6). Accordingly, the second element of Plaintiff's *prima facie* case is met. Rather, the contention lays in the first and third elements, as Defendant claims that Plaintiff cannot establish a *prima facie* case of retaliation because Plaintiff cannot show that she engaged in a protected activity nor demonstrate a causal connection between any purported protected activity and the adverse employment action she suffered. (Doc. 32 at 13).

### 1. Whether Plaintiff Engaged in a Protected Activity

As to the first element, Defendant claims that "Plaintiff admits that she never exercised any rights under Arizona's workers' compensation statutes because she did not miss any work as a result of her wrist injury, . . . and never filled out any workers' compensation paperwork or otherwise sought benefits." (*Id.* at 13–14 (citing Doc. 33 ¶¶ 31–32)). Defendant also asserts that "Plaintiff admits she has no basis or evidence to support a claim of retaliation based on her alleged exercise of any right under the workers' compensation statutes." (*Id.* at 14). In support of these contentions, Defendant only cites its own Statement of Facts (Doc. 33 ¶¶ 31–32), which purports that the following portion of Plaintiff's deposition corroborates these statements:

> Q: Did you fill out any workers' comp paperwork, like making a claim?
> A: I don't think so.
> Q: Yeah, I didn't see anything. That's why I was asking. Why do you think Walmart retaliated against you in some way for this workers' comp thing? Where does that claim come from?
> A: I don't know.
> Q: Okay. And you didn't miss any time as a result of your wrist injury, right?
> A: No.

(Doc. 33-2 at 5, Plaintiff Depo. at 98: 8–99:10).

As a preliminary matter, the Court notes that *nowhere* in Plaintiff's deposition testimony—or in any other portion of the record—does Plaintiff admit that "she has no basis or evidence to support a claim of retaliation," as Defendant claims, (Doc. 32 at 14). Rather, Plaintiff merely answered "I don't know" in response to questioning by counsel for Defendant. (Doc. 33-2 at 5, Plaintiff Depo. at 99:7). Moreover, while Plaintiff stated in her deposition that she did not miss any time as a result of her wrist injury, (Doc. 33-2 at 5, Plaintiff Depo. at 99:8–10), Plaintiff left her scheduled shift on May 24, 2016 to get x-rays and submit a post-accident drug screen in accordance with Defendant's company policy, (Docs. 33-3 ¶ 12; 36 ¶ 31).

Although Defendant asserts that "Plaintiff's reporting of her wrist injury[] is not tantamount to 'exercising a right under the workers' compensation statute,' for purposes of establishing that she engaged in a protected activity," (Doc. 32 at 13 (citing *Quinones v. Potter*, 661 F. Supp. 2d 1105, 1126–27 (D. Ariz. 2009)), the Court disagrees. However, Defendant's reliance on *Quinones v. Potter* is misplaced, as that case nowhere indicates that reporting of an on the job injury is not equivalent to engaging in protected activity under the workers' compensation statutes of Arizona.[28] Rather, the AEPA states that a wrongful termination claim can be brought against an employer "in retaliation for" the "exercise of rights under the workers' compensation statutes prescribed in chapter 6 of this title." A.R.S. § 23-1501(A)(3)(c)(iii); *see id.* at § 23-901 *et seq*. In particular, the workers' compensation statutes provide that injured employees shall be compensated "for loss sustained on account of the injury," including "medical, nurse and hospital services and medicines." A.R.S. § 23-1021.

Here, Plaintiff exercised her right to receive compensation under the workers'

---

[28] *Quinones v. Potter* involved an employee who alleged, in part, that her former employer retaliated against her in violation of Title VII. *Quinones*, 661 F. Supp. 2d at 1117. There, the district court granted summary judgment for the employer on the employee's retaliation claim because the employee failed to demonstrate that she engaged in any protected activity. *Id.* at 1126–27. Specifically, the district court determined that the employee's submission of medical documentation, requests for continued temporary light duty assignments, and requests for "time on the clock" to work on her EEOC complaint did not constitute "protected activities," nor reasonably put her former employer on notice that she was opposing discrimination. *Id.* at 1127.

compensation statutes by reporting her "accident and the injury resulting from the accident" to her employer on May 21, 2016 in accordance with A.R.S. § 23-908(E). (Docs. 33 ¶ 16; 36 ¶ 16). Although Plaintiff did not personally "file" a workers' compensation claim, she did fill out an Associate Incident Report on the date of her accident, (Doc. 36-1 at 12), which began Defendant's investigation into her accident, (*id.* at 32, 34–35, 42–43), and which ultimately resulted in the generation of a workers' compensation claim by Defendant on Plaintiff's behalf, (*id.* at 10, 14, 16). (*See* Doc. 36 ¶¶ 31–32). Plaintiff also requested additional medical treatment for her injuries from Ms. Vaughn beyond her initial visit to the clinic on May 24, 2016. (Docs. 36 ¶¶ 55–57; 36-1 at 30 (email from Ms. Vaughn on June 28, 2016 stating that Plaintiff requested medical care for her work injury on May 21, 2016)). As Plaintiff exercised her rights under § 23-1021 of the workers' compensation statutes, the Court finds that Plaintiff engaged in protected activity. Therefore, Plaintiff has met the first element of her *prima facie* case.

2. Whether There is a Causal Link Between the Purported Protected Activity and Plaintiff's Termination

Although Defendant claims that Plaintiff cannot show a causal connection between any purported protected activity and the adverse employment action she suffered, (Doc. 32 at 13), the Court finds that Plaintiff has established this third element of her *prima faci*e case for retaliation. "To prove this 'causal link,' the employee must show that the employer's 'retaliatory motive played a part in the employment action.'" *Knox v. United Rentals Highway Techs., Inc.*, No. CIV07-0297-PHX-DKD, 2009 WL 806625, at *5 (D. Ariz. Mar. 26, 2009) (quoting *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 798 (9th Cir. 1982)). "[T]he plaintiff must make some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity." *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003); *see also Stephens v. Nike, Inc.*, 611 F. App'x 896, 897 (9th Cir. 2015) (affirming summary judgment in favor of the employer on the plaintiff's Title VII retaliation claim where plaintiff "failed to raise a genuine dispute of material fact as

to whether the relevant decision maker was aware of his protected activity").

Despite producing workers' compensation related paperwork in this litigation, (Doc. 36 ¶ 53), Defendant argues that there is no evidence "whatsoever" that Defendant "had any knowledge regarding [Plaintiff's] purported workers' compensation claim." (Doc. 37 at 9). Frankly, the Court finds it disingenuous for Defendant to argue that it was "not aware that Plaintiff submitted a workers' compensation claim when it terminated her employment," when Defendant filed Plaintiff's workers' compensation claim on her behalf. (*Id.*; *see* Docs. 36-1 at 10 (letter from the Industrial Commission of Arizona's Claims Division to Plaintiff on June 7, 2016, alerting Plaintiff that her "employer's insurance carrier has been notified of [her] claim"); 36-1 at 35 (noting that Manager Investigation Report completed by Mr. Deese was mailed to Claims Management, Inc. by Debra Vaughn on May 26, 2016 via USPS)). Furthermore, an email chain in the record between Debra Vaughn, Defendant's Personnel Coordinator, and Jason Krongaard, Defendant's Market Asset Protection Manager, clearly demonstrates that Defendant knew of Plaintiff's workers' compensation claim prior to Plaintiff's termination on July 22, 2016. (Doc. 36-1 at 29–30). Specifically, Ms. Vaughn emailed Mr. Krongaard on June 28, 2016—almost an entire month before Plaintiff's termination—stating: "I need direction in regards to Carol Whitmire. She is requesting medical care for her work injury on 5/21/2016 [for] Claim #C6477157." (*Id.* at 30). In addition to proving that Defendant had actual knowledge of Plaintiff's workers' compensation claim, this email also demonstrates that Defendant was aware of Plaintiff's requests for additional medical treatment for her work-related injury. (*See* Doc. 36 ¶¶ 55–57).

Moreover, the Ninth Circuit has held that "causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (citations omitted); *see also Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000) ("That an employer's actions were caused by an employee's engagement in protected activities may be inferred from proximity in time between the protected action and the allegedly

retaliatory employment decision.") (citation and internal quotations omitted). Here, Plaintiff asserts that her "retaliation claim is premised on the fact that she was terminated practically in the midst of Wal-Mart's 'handling' of her workers' compensation claim and her asking for additional medical treatment." (Doc. 35 at 15). A period of 62 days elapsed from the time Plaintiff first filled out an incident report on the date of her injury (May 21, 2016) to the date of her termination (July 22, 2016). (Doc. 35 at 15–16); (*see also* Docs. 33 ¶ 26; 36-1 at 12). Moreover, from the date Plaintiff first obtained treatment for her wrist injury on May 24, 2016, 59 days passed to the date of her termination. (Doc. 35 at 15–16). Finally, from June 7, 2016—the date on which Plaintiff requested additional medical treatment for her work injury from Ms. Vaughn—just 45 days elapsed to the date of Plaintiff's termination. (*Id.*; *see also* Docs. 36 ¶¶ 55–57; 36-1, Decl. of Plaintiff ¶¶ 26–27).

The Ninth Circuit has held that adverse employment actions occurring within similar intervals of time after protected activity support an inference of causation. *See Thomas v. City of Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004) (concluding that seven week lapse between protected activity and adverse employment action was sufficient evidence of causation); *Miller v. Fairchild Indus.*, 885 F.2d 498, 505 (9th Cir. 1989) (holding that a *prima facie* case of causation was established when discharges occurred forty-two and fifty-nine days after protected activity); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (holding that sufficient evidence of causation existed where adverse employment actions occurred less than three months after complaint filed, two weeks after charge first investigated, and less than two months after investigation ended); *see also Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) ("Depending on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation."). Accordingly, the Court finds that sufficient evidence of a causal link exists between Plaintiff's protected activity and her termination from Defendant's employ. Therefore, Plaintiff has provided sufficient evidence to make out a *prima facie* case of retaliatory discharge in violation of A.R.S. § 23-1501(A)(3)(c)(iii).

### 3.    Legitimate, Non-Retaliatory Reason and Pretext

"If Plaintiff provides sufficient evidence to make out a *prima facie* case of retaliation, then the burden shifts to Defendant to articulate some legitimate, non-retaliatory reason for its actions." *Levine*, 2010 WL 864498, at *8 (citing *Porter v. California Dep't of Corrections*, 419 F.3d 885, 894 (9th Cir. 2005)). "If Defendant sets forth such a reason, then Plaintiff must show that Defendant's proffered reason is merely pretext for the underlying retaliatory motive."[29] *Id.*

Here, Defendant has met its burden of articulating a legitimate, non-retaliatory reason for terminating Plaintiff. Specifically, Defendant stated that Plaintiff was fired because Walmart had a good faith basis to believe Plaintiff was impaired by marijuana at work on May 24, 2016 based on the results of her positive drug test. (Doc. 32 at 14 ("Plaintiff was terminated because she tested positive for marijuana, and Walmart has a bright-line policy of terminating employees who test positive for a Schedule I controlled substance like marijuana, including medical marijuana cardholders who are deemed to be impaired at work."). Therefore, the deciding question is whether Plaintiff has produced enough evidence from which a reasonable factfinder could conclude that Defendant's proffered reason was pretext for retaliation.

In this case, Plaintiff has not offered any evidence suggesting that Defendant did not honestly believe its legitimate, non-retaliatory reason for terminating her, nor argued

---

[29] Although the district court has previously applied this *McDonnell Douglas* burden-shifting framework in the context of a retaliatory discharge claim under A.R.S. § 23-1501(A)(3)(c)(iii), the Court could find not find any opinions from the Arizona Court of Appeals or Arizona Supreme Court applying this framework to a claim under A.R.S. § 23-1501(A)(3)(c)(iii). Nevertheless, the Arizona Court of Appeals recently noted in an unpublished decision that the Arizona Court of Appeals "has applied the *McDonnell Douglas* burden-shifting framework to wrongful discharge claims under A.R.S. § 41–1464 (alleged retaliation for asserting employment discrimination violations), *see Najar v. State*, 198 Ariz. 345, 347–48, ¶ 8 (App. 2000), and *we agree . . . that the framework likewise applies to claims under § 23–1501.*" *Czarny v. Hyatt Residential Mktg. Corp.*, No. 1 CA-CV 16-0577, 2018 WL 1190051, at *2 (Ariz. Ct. App. Mar. 8, 2018) (emphasis added). Pursuant to Rule 111 of the Supreme Court of Arizona, the Court recognizes that *Czarny v. Hyatt Residential Mktg. Corp.* is a memorandum decision and, thus, is not precedential. AZ ST S CT Rule 111(c). However, this memorandum decision may be cited for persuasive value, as it is here, since "it was issued on or after January 1, 2015; no opinion adequately addresses the issue before the court; and the citation is not to a depublished opinion or a depublished portion of an opinion." *Id.*

that the reasons provided by Defendant were pretext for retaliation. (*See* Doc. 35). At most, there is temporal proximity between Plaintiff's protected activity under Arizona's workers' compensation statutes and her termination, which is not enough to sustain a claim for retaliatory discharge. As Plaintiff has failed to point to evidence of pretext, the Court is unable to determine that there is a genuine dispute of material fact on this claim. Accordingly, the Court grants summary judgment for Defendant on Plaintiff's Fourth Cause of Action alleging retaliatory discharge under the AEPA.

**IV.    CONCLUSION**

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

**IT IS ORDERED** that Plaintiff's Rule 56(d) Application (Doc. 35 at 11–13) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 32) is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** as to Plaintiff's Third Count alleging wrongful termination under the ACRA, and as to Plaintiff's Fourth Count alleging retaliatory discharge for the exercise of rights under the workers' compensation statutes in violation of the AEPA. Defendant's Motion for Summary Judgment is **DENIED** as to Plaintiff's Second Count alleging discrimination under the AMMA.

**IT IS FURTHER ORDERED** that, pursuant to Rule 56(f), the Court is *sua sponte* granting summary judgment in part for Plaintiff on a non-filed cross-motion for summary judgment solely on the question of liability on Plaintiff's Second Count alleging discrimination under the AMMA.

**IT IS FURTHER ORDERED** that Plaintiff's First Count alleging wrongful termination under the AMMA and AEPA is **DISMISSED** as duplicative of Plaintiff's Second Count.

**IT IS FINALLY ORDERED** affirming all trial dates solely for the issue of damages on Plaintiff's Second Count alleging discrimination under the AMMA. When filing a proposed Final Pretrial Order, the parties shall specifically address whether the AMMA provides a right to a trial by jury, whether the AMMA provides for a claim for reinstatement, and what specific damages Plaintiff seeks.

The Clerk of the Court shall not enter judgment at this time.

Dated this 7th day of February, 2019.

James A. Teilborg
Senior United States District Judge